IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAR 2 7 2002

Michael N. Milby
Clerk of Court

JACK ABBOT GREBE, JR.,                    )
                                          )
        Petitioner,                       )   CASE NO: **B-02-** 058
                                          )                    _____
                                          )                    415
vs.                                       )   Formerly: B-98-00414-02-S1
                                          )
UNITED STATES,                            )
                                          )
        Respondent.                       )
                                          )

---

**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO
28 UNITED STATES CODE SECTION 2255**

---

COMES NOW, the Petitioner herein, Jack Grebe, through the undersigned counsel, who

moves this Honorable Court to vacate the conviction and sentence heretofore imposed, based upon

the ineffective assistance of counsel he received at the trial stage.  In support hereof, the Petitioner

states the following:

1.      John Cain, a government informant, testified that he met John Roberts, Oliver Emigh, and

        Johnie Wise at the Bargain Barn, owned by Roberts, in February or March of 1998.  Roberts

        told Cain that he was a member of the Republic of Texas (hereinafter referred to as "RT") and

        needed someone to type documents for RT legal matters and do computer work.  Cain

        offered his assistance.

2.      A few days later, Cain contacted the F.B.I. to make sure that what he was doing for the RT

        would not get him into trouble.  The F.B.I. did not express concern with the matter.  Roberts

1

asked Cain to run warrant checks. Cain again contacted the F.B.I. who told Cain to tell Roberts that it was illegal to do what he requested.

3.     Sometime while Cain was working for Roberts he met the Petitioner, Jack Grebe, at a RT meeting. Cain testified that Wise mentioned the use of a lighter converted into a dart gun, with the dart made out of a cactus thorn coated with slow-acting poison.

4.     Cain also testified that he had meetings with Grebe and Wise in which they asked questions about using the Internet without leaving a trail. Cain stated that Grebe and Wise wanted to know how to find email addresses of several government agencies. Wise talked about sending a letter to the agencies about men using the dart gun. After this, the F.B.I. requested to meet with Cain. The contact with the F.B.I. occurred bi-weekly.

5.     Cain showed the F.B.I. a letter describing a bizarre rendition of purported federal employees overhearing the poison dart plan. Church, an F.B.I. agent, asked Cain if he wanted to work with the F.B.I. at this point. Cain accepted the invitation to work as a paid FBI informant and eventually received $16,000 from the FBI for this investigation. (Sentencing, p. 8)

6.     Cain testified that he produced a finalized document of a declaration of war presented to him by Wise and Grebe. Grebe was present during a meeting between Cain and Wise where Wise described sending a message after the declaration of war that would threaten the use of biological weapons.

7.     Agent Church admitted during cross-examination that he had Cain suggest names for e-mails to Wise and Grebe.

8.     Agent Scott Decker testified that nothing suspicious in nature or anything that needed to be tested or any materials that would have been used to construct a weapon of mass destruction

2

were found during the search of the residences belonging to Wise and Grebe. Agent Decker

also testified about use of biological agents as weapons of mass destruction and stated that

he had read literature that illustrated the infection of individuals with HIV from needle sticks

and the death of a single Middle Eastern operative as a result of the injection of a toxin.

9.     Cain's father and ex-wife testified that Cain, the now paid government informant, was not

truthful and would blow things out of proportion for personal glory.

10.    On August 8, 1998, Mr. Grebe was charged in an eight-count superseding indictment. The

first count charged conspiracy to use and attempt to use a weapon of mass destruction in

violation of 18 U.S.C. §§ 2332a(a)(2) and (c)(2)(C). Counts Two through Eight charged

threatening to use a weapon of mass destruction in violation of 18 U.S.C. §§ 2332a(a)(2) and

(c)(2)(C).

11.    On October 29, 1998, the jury found Mr. Grebe guilty on Counts Five and Six only,

Threatening to Use a Weapon of Mass Destruction.

12.    Prior to sentencing, the Pre-sentence Investigation Report recommended the following

offense level calculation:

| | |
|---|---|
| Base Offense Level (using § 2A6.1) | 12 |
| § 2A6.1(b)(1) (involving conduct evidencing intent to carry out the threat) | +6 |
| § 3A1.2(a) (official victims) | +3 |
| § 3A1.4(a) (promote a federal crime of terrorism) | +12 |
| Total Offense Level | 33 |

For the multiple-count adjustment, the Report recommended a combined adjusted offense

level of 35. Although Mr. Grebe did not have any juvenile or adult criminal convictions, the

Report recommended a criminal history category of VI pursuant to U.S.S.G. § 3A1.4. This resulted in Guideline range of imprisonment of 292 to 365 months.

13.    At sentencing, on February 5, 1999, counsel for the Petitioner made arguments that the sentencing enhancement under § 3A1.4(a) was not applicable because the Petitioner's conviction under 2332(a) did not relate to a weapon of mass destruction. (Sentencing, p. 10) Counsel further argued that even if § 3A1.4 was applicable, then the Defendant's case fell outside the heartland of the Guidelines and a downward departure was appropriate. Counsel argued that a downward departure was appropriate because of the Government's conduct in promoting and manipulating the offense warranted a downward departure. (Sentencing 5-14). Additionally, Counsel argued that § 2A6.1(b)(1) enhancement was not applicable because the Defendant had no intent to carry out the threats. (Sentencing 16-17). Finally, it was argued by counsel that the § 3A1.2(a) enhancement was inapplicable because the guideline does not apply when the victim is an organization, agency or government. (Sentencing 18-19)

14.    The Court found that each of the enhancements did apply to the Petitioner. (Sentencing 14-15, 18, 19). Further, the Court denied any request for a downward departure. (Sentencing p. 20). The Court then sentenced Mr. Grebe to 292 months imprisonment on each count to run concurrently.

15.    On February 11, 1999, Mr. Grebe filed a notice of appeal. On appeal, the following issues were raised: 1) the government's conduct constituted entrapment as a matter of law; 2) the trial court failed to properly charge the jury on the issue of the effect on interstate commerce of their acts; 3) the evidence was not sufficient to sustain the jury's verdict as to the question of unlawful activity; 4) the evidence was insufficient to sustain the jury's verdict because the

4

superseding indictment failed to charge an essential element of the offense; 5) the government made improper comments during final argument; 6) the evidence was insufficient to sustain the jury's verdict as to the element of affecting interstate commerce; 7) the trial court erred in refusing to charge the jury on spoilation; and 8) the trial court erred in admitting the government's expert testimony.  Importantly, despite the fact the Petitioner had objected to his sentencing calculation, no sentencing issues were raised on appeal.

16.    On July 31, 2000, the Court of Appeals for the Fifth Circuit affirmed the judgment of the District Court.

17.    Subsequently, Mr. Grebe filed a petitioner for Writ of Certiorari with the U.S. Supreme Court.  This was denied on April 10, 2001.

WHEREFORE, in consideration of the foregoing, as well as the arguments of law contained in the attached Memorandum of Law, the Petitioner respectfully prays that this Court issue an order vacating the conviction and sentence heretofore imposed in the instant case, based upon the violations of Petitioner's constitutional protections.

Respectfully submitted,

Matthew M. Robinson, Esq.
Attorney for Petitioner
KY Bar # 88750
11331 Grooms Road, Suite 3000
Cincinnati, Ohio 45242
(513) 381-8033  voice
(513) 381-8043  facsimile

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JACK ABBOT GREBE, JR., | ) | |
| | ) | |
| Petitioner, | ) | CASE NO: _____ |
| | ) | |
| vs. | ) | Formerly: B-98-00414-02-S1 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 UNITED STATES CODE SECTION 2255

As a matter of introduction, Petitioner respectfully submits that the events which transpired in the instant case constitute a denial of Petitioner's right to effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution and a denial of his due process under the Fifth Amendment because he received an enhanced sentence based upon information that was never submitted in the indictment or proven beyond a reasonable doubt. In short, the Petitioner submits that his sentence in the instant case should be vacated because of the ineffective assistance of his counsel and the unduly harsh sentence.

### STATEMENT OF ISSUES FOR CONSIDERATION

Petitioner Jack Grebe respectfully requests that this Court adjudicate the following issues:

1.    Petitioner's counsel was ineffective on appeal because counsel failed to raise viable issues concerning the calculation of Mr. Grebe's offense level.

1

2.      Petitioner was denied Due Process based on the Fifth Amendment to the United
States Constitution when he received a drastically enhanced sentence based upon
information that was never submitted in the indictment or proven beyond a
reasonable doubt.

Petitioner seeks relief due to the ineffective assistance of counsel in violation of his Sixth Amendment and to the enhancements of his sentence that were not in the indictment resulting in Due Process violations based on the Fifth and Fourteenth Amendments to the United States Constitution.  In all cases, when such errors occur at the trial level, and actual prejudice results, 28 U.S.C. § 2255 provides for collateral review. See United States v. Frady, 456 U.S. 152 (1982).  To be successful in a collateral review under § 2255, a party must show a threshold causal event and prejudice to the defendant. As indicated in the arguments that follow, both cause and prejudice are present in this case.

**ARGUMENT**

**I.      PETITIONER'S SIXTH AMENDMENT RIGHT WAS VIOLATED DUE TO INNEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL**

The Sixth Amendment to the United States Constitution insures effective assistance of legal representation to all criminal defendants. "The right to competent counsel must be assured every man accused of crime in Federal court." State of Union Address, John F. Kennedy, January 14, 1963, U.S. Code Cong. and Admin. News, 2990.  An abridgment of this core, constitutional right represents an error of constitutional magnitude requisite to sustaining a motion for post-conviction relief under 28 U.S.C. § 2255.

As this court knows well, the Sixth Amendment to the United States Constitution guarantees that every criminal defendant is entitled to the assistance of counsel at *all* levels of

2

proceedings. The Supreme Court has made clear that "[t]he right to counsel is a fundamental

right of criminal defendants; it assures the fairness, and thus, the legitimacy, of our adversary

process." Kimmelman v. Morrison, 477 U.S. 365, 374 (1986). Furthermore, the Supreme Court

has recognized that "the right to counsel is the right to the effective assistance of counsel."

McMann v. Richardson, 397 U.S. 759, 771 (1970). The right to effective assistance of counsel at

any critical stage encompasses the right to have an advocate for one's cause. Avery v. Alabama,

308 U.S. 444 (1940). Counsel must subject each aspect of the Government's case, as well as the

factors presented at sentencing "to meaningful adversarial testing." United States v. Cronic, 466

U.S. 648 (1984). See also United States v. Stevens, 851 F.2d 140, 145 (6th Cir. 1988); United

States v. Barnes, 83 F.3d 934 (7th Cir. 1996).

      To see whether counsel has fallen below the minimum standard needed for effective

assistance of counsel under the Sixth Amendment to the Constitution, a two-prong test must be

met. In Strickland v. Washington, 466 U.S. 668(1984), the Supreme Court outlined this two-

prong test for ineffective assistance of counsel. A petitioner must demonstrate that counsel's

performance on appeal fell below an objective standard of reasonableness, and must show a

"reasonable probability" that, but for counsel's errors, the results of the proceedings would have

been different. Id. at 688, 694. A "reasonable probability" is one "sufficient to undermine

confidence in the outcome," and it is a standard less than proof by a preponderance of the

evidence. Strickland, 466 U.S. at 694.

      The right to counsel extends to appeals. A defendant in a criminal case has a Sixth

Amendment right to the effective assistance of counsel on direct appeal. See Evitts v. Lucey, 469

U.S. 387, 406, 83 L. Ed. 2d 821, 105 S. Ct. 830 (1985); Goodwin v. Johnson, 132 F.3d 162 (5th

3

Cir. 1997); Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000). The test to establish a claim that

*appellate* counsel was ineffective for failing to pursue a claim on direct appeal is the same

Strickland standard. See 466 U.S. at 688, 694. *See* Smith v. Robbins, 528 U.S. 259, 120 S. Ct.

746, 764, 145 L. Ed. 2d 756 (2000) (holding that a habeas applicant must demonstrate that

"counsel was objectively unreasonable" in failing to file a merits brief addressing a non-frivolous

issue and that there is "a reasonable probability that, but for his counsel's unreasonable failure * *

*, he would have prevailed on his appeal").

The Supreme Court has recently reiterated that "when ignored issues are clearly stronger

than those presented, the presumption of effective assistance of counsel will be overcome."

Robbins, 120 S. Ct. at 765 (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)). In te

instant case, counsel fell below an objective level of reasonableness when he omitted the

arguments below from the Petitioner's appeal brief.

**A.    The sentencing enhancement under § 3A1.4(a) was not applicable because the Petitioner's conviction under 2332(a) did not relate to a weapon of mass destruction.**

At sentencing counsel for the Defendant made a strenuous and viable argument that the

sentencing enhancement under U.S.S.G. § 3A1.4 was not applicable to the Defendant.

U.S.S.G. § 3A1.4 provides for an enhancement of 12 levels or a minimum offense level of 32

if the offense of conviction "is a felony that involved, or was intended to promote, a federal crime of

terrorism..." Additionally, the section calls for a Criminal History Category VI, regardless of the

defendant's criminal past. Importantly, the affect of this enhancement on the Petitioner was to

increase his guideline range of imprisonment from a possible low of 10 to 16 months, to a range of

292 to 365 month.

4

A *federal crime of terrorism* is defined at 18 U.S.S.G. § 2332b(g)(5) and requires that if the offense of conviction is "calculated to influence or affect the conduct of government . . . or to retaliate against government conduct;" and, if the offense is pursuant to 18 U.S.C. § 2332a it must be related to the *use* of weapons of mass destruction.

The enhancement was not applicable to the Petitioner for two reasons. First, the only the evidence of a "weapon of mass destruction" was testimony of discussions of a fanciful plan to use a Bic lighter to shoot cactus needles contaminated with some sort of poison at unsuspecting individuals. For purposes of the § 3A1.4 enhancement, this was not a weapon of mass destruction. Second, the offense did not involve the actual *use* of a weapon, but the mere threatened use of a weapon that didn't exist and was impossible to create. Importantly, the defense showed that this fantasy dart gun would never have been able to work. Such a fanciful plan cannot be seriously regarded as a weapon of mass destruction. To hold that the mere impossible plan of using a Bic lighter to shoot poison darts fulfills the definition of a "weapon of mass destruction" would work absurd results. Hypothetically, any individual who threatens death or bodily harm through the use of magic or voodoo or other fanciful means would be guilty of threatening the use of a weapon of mass destruction. The Petitioner's alleged plan had no more possibility of being carried out than had the defendants threatened to contact a witch doctor to create a magical spell that would release a cloud of poison in some government building. These examples may be absurd, but they are no more absurd than a determination that a contraption not even in existence and impossible to create (Bic lighter poison dart gun), is a "weapon of mass destruction."

Defense counsel raised an objection to this enhancement at sentencing. In light of the twenty to twenty-five year enhancement resulting from the application of this section of the Guidelines,

5

Counsel's failure to continue his objection on appeal was objectively unreasonable. Additionally, as shown above, there was a reasonable probability that had this enhancement been challenged on appeal, the Petitioner's sentence would have been vacated and remanded. Accordingly, counsel was ineffective on appeal for failing to argue this significant and viable sentencing issue.

**B. The § 2A6.1(b)(1) enhancement was not applicable because the Petitioner had no intent to carry out the threats.**

The Court mistakenly applied a six-level enhancement under § 2A6.1(b)(1) because the offense allegedly involved conduct evidencing an intent to carry out the threat.

Section 2A6.1(b)(1) provides that, "if the offense involved any conduct evidencing an intent to carry out such threat, increase by 6 levels." U.S.S.G. §§ 2A6.1(b)(1). There are no published cases from this Circuit which address the application of §§ 2A6.1(b)(1). In United States v. Carter, 111 F.3d 509, 513 (7th Cir. 1997), the Seventh Circuit upheld the imposition of the §§ 2A6.1(b)(1) enhancement because the nature of the defendant's threats, his possession of weapons specifically referred to in connection with the threats, and his past physical abuse of the victim, sufficiently supported the enhancement. Id. at 513-14; United States v. Sullivan, 75 F.3d 297, 302-03 (7th Cir. 1996) (upholding enhancement based upon defendant shooting out victim's husband's car windows and his verbal repetition of threats against victim to law enforcement officer); United States v. Carter, 111 F.3d 509, 513-14 (7th Cir. 1997) (affirming district court's application of §§ 2A6.1(b)(1) because defendant was arrested while in possession of semiautomatic pistol, three loaded, matching magazines and firearm with which he threatened to kill victim).

In United States v Goynes, 175 F.3d 350 (5th Cir. 1999) this Circuit held that the writing of multiple threatening letters and the nature of their content alone are insufficient to justify application

6

of § 2A6.(1)(b)(1) enhancement.  In that case, the defendant had written several letters with extremely violent threats.  Further, one of the letters was  signed in blood.  This Circuit held that "these acts are merely threats and not conduct sufficiently evidencing an intent to carry out a threat.  Furthermore, although the signing of the letter in blood is disturbing, it is not in any way an actual step toward the realization of Goynes' threats." Id. at 355.  Accordingly, in order to receive the enhancement, there must be some overt act that the court can point toward that evidences the intent to carry out the threatening communication.  Id.

In the instant case, counsel objected to the enhancement at sentencing stating that there was no evidence that indicated the "intent" to carry out the threats.  In fact, as pointed out by counsel, the Defendant was acquitted of the conspiracy to commit the terrorist acts and therefore there was no showing of intent.  It is assumed that the conduct evidencing the intent to carry out the threats is the discussion concerning the Bic lighter dart gun.  As indicated previously, this alleged scheme was impossible to carry out.  Furthermore, the mere discussion concerning the Bic Lighter dart gun cannot be characterized as a an overt act that evidences the intent to carry out the threats sent via e-mail.  Accordingly, counsel had a meritorious issue that was ripe for appeal.  Moreover, as discussed above, the enhancement was clearly improper.  In light of the case law out of the Fifth Circuit, it was objectively unreasonable for counsel to omit this issue on appeal.  Accordingly, appellate counsel was ineffective on appeal for failing to address this important sentencing issue.

## II. APPRENDI SHOULD BE APPLICABLE TO ALL ENHANCEMENTS, THE DISTRICT COURT APPLIED THE WRONG STANDARD IN DETERMINING THE ENHANCEMENTS AT SENTENCING.

The Defendant submits that due process was violated when the district court applied several sentencing enhancements that resulted in a 20 to 25 year increase in the Petitioner's sentence.

As this Court knows, the Supreme Court has recently set new precedent which requires that factors mentioned in a statute that result in a statutory enhancement of a criminal defendant's sentence must be submitted to the jury as an element of the offense rather than a mere sentencing factor to be determined by the sentencing judge. Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), (any fact, other than a prior conviction, that increases the penalty beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt); see; Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215 (1999).

### A. Retroactivity

At the outset, the Petitioner recognizes that the Government will likely assert that rule announced in Apprendi does not apply to this case because it is a new rule or procedural law and that the U.S. Supreme Court must make the rule retroactively applicable on collateral review. The Petitioner submits that raising this due process argument based on Apprendi does not present a retroactivity problem. There is no retroactivity problem in this case because the Apprendi case was decided before the Petitioner's conviction was final and while it was on direct review. Therefore, since the Petitioner's conviction was not final at the time Apprendi was decided, there is no retroactivity issue in this case.

Of course, the Petitioner recognizes that a § 2255 motion is not the place to argue issues that could have been addressed on direct appeal unless the Petitioner can show cause for failing to raise

8

the issue on direct appeal.  Clearly, in the instant case, adequate cause can be shown for the failure of

the Petitioner to raise this issue on appeal.  First, the Apprendi case was not decided until June 26,

2000; 19 days after oral arguments had been heard in the instant case and only one month prior to the

Fifth Circuit judgement affirming the Petitioner's conviction.  Appellate counsel had no reasonable

way of knowing the implications of Apprendi and how its holding could after the Petitioner's

conviction and sentence. Surely, the time line suggests that there is adequate cause to excuse the

Petitioner's failure to raise the Apprendi issue on direct appeal.  Accordingly, the Petitioner now

raises this issue for the first time.

### B.    The Rule in Apprendi

To summarize, Apprendi and its progeny have changed the face of criminal law by providing

that when the government seeks enhanced penalties based upon certain factors, those factors must be

alleged in the indictment and submitted to a jury for a finding of proof beyond a reasonable doubt.  In

other words, factors that increase penalties beyond the statutory maximum must be conveyed to a

defendant through the indictment and proven beyond a reasonable doubt. Id. at  2362-63.

As this court knows, this new line of reasoning completely changed the interpretation of

many federal crimes.  While Apprendi involved a New Jersey hate crime statute, it is clear that its

broad constitutional principles implicate the federal drug statutes.  *See* Apprendi, (explicitly

describing its holding as constitutionally based), and subsequent remands and circuit court cases.

Before moving onto the substantive allegations based upon Apprendi, Petitioner reviews the holding

of the case and subsequent interpretations.

At issue in Apprendi were two New Jersey statutes, one which classified possession of a

firearm for an unlawful purpose as "second degree" offense warranting a five to ten year sentence

9

and the other called the "hate crime law" which provides for an extended term of imprisonment if the

trial judge finds that the defendant acted with a purpose to intimidate an individual or group of

individuals due to race, color, gender, etc. Apprendi, 120 S.Ct. at 2351, *citing* N.J. Stat. Ann. §

2C:39-4(a)(West 1995); N.J. Stat. Ann. § 2C:44-3(e)(West Supp. 2000). In determining that the

New Jersey procedure was unconstitutional, the U.S. Supreme Court analyzed the history of criminal

law and decisions involving proof of all elements of a crime beyond a reasonable doubt. "At stake in

this case are constitutional questions of surpassing importance: the proscription of any deprivation

of liberty without due process of law, Amdt. 14, and the guarantee that [i]n all criminal prosecutions,

the accused shall enjoy the right to a speedy and public trial, by an impartial jury, Amdt. 6." Id. at

2355 (internal quoted omitted). These rights entitle a criminal defendant to a determination by the

jury that he is guilty of every element of the crime charged beyond a reasonable doubt. Id.

> In sum, our reexamination of our cases in this area, and of the history upon
> which they rely, confirms the opinion that we expressed in Jones. Other than
> the fact of a prior conviction, any fact that increases the penalty for a crime
> beyond the prescribed statutory maximum must be submitted to a jury, and
> proved beyond a reasonable doubt. With that exception, we endorse the rule
> set forth in the concurring opinions in that case: "[I]t is unconstitutional for a
> legislature to remove from the jury the assessment of facts that increase the
> prescribed range of penalties to which a criminal defendant is exposed. It is
> equally clear that such facts must be established by proof beyond a
> reasonable doubt."

Id. at 2362-63, *quoting* Jones v. United States, 526 U.S. 227, 252-53, 119 S.Ct. 1215, 1228-29

(1999) (Stevens, J. concurring), and *citing* id. at 253, 119 S.Ct. at 1229 (Scalia, J. concurring)

(internal citations omitted).

Simply stated Apprendi adopts the position that "it is unconstitutional for a legislature to

remove from the jury the assessment of facts that increase the prescribed range of penalties to

which a criminal defendant is exposed. It is equally clear that such facts must be established by

proof beyond a reasonable doubt." Apprendi, 530 U.S. 466, 120 S.Ct. at 2362-63, *quoting* Jones

v. United States, 526 U.S. 227, 252-53, 119 S.Ct. 1215, 1228-29 (1999) (Stevens, J. concurring),

and *citing* id. at 253, 119 S.Ct. at 1229 (Scalia, J. concurring). Therefore, Apprendi clearly

mandates that any element that serves to increase a penalty for a crime beyond the statutory

maximum must be submitted to the jury and proven beyond a reasonable doubt.

At this juncture, Petitioner recognizes that Apprendi has not yet been held to apply to

enhancements under the Federal Sentencing Guidelines when the statutory maximum sentence has

not been exceeded.  However, it is submitted that under a rational reading of Apprendi, its tenets

and in light of general United States' ideology of justice, the enhancements that the Petitioner

received at sentencing should have been proved beyond a reasonable doubt.

Undoubtedly, the government will counter that no Apprendi violation occurred in this

matter because Petitioner was not sentenced beyond the statutory maximum.  Petitioner

recognizes the plain vanilla language of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348

(2000), that factors, other than prior convictions, that result in a statutory enhancement of a

criminal defendant's sentence beyond the statutory maximum, must be submitted to the jury as an

element of the offense rather than a mere sentencing factor to be determined by the sentencing

judge.  120 S.Ct. at 2362-63 (citing Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215

(1999)).  However, that was not the reasoning employed by all the Justices.   In submitting this

argument, Petitioner urges this court to follow the reasoning of Justice Thomas' concurring

opinion from Apprendi, which concluded that the majority's decision did not go far enough.

Justice Thomas' opinion, joined in part by Justice Scalia, reviewed the history of what constitutes

a "crime." Apprendi, 530 U.S. 466, 120 S.Ct. at 2367-68.

11

A long line of essentially uniform authority addressing accusations, and stretching from the earliest reported cases after the founding until well into the 20th Century, establishes that the original understanding of which facts are elements was even broader than the rule the Court adopts today.

This authority establishes that a "crime" includes every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment). This, if the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact—of whatever sort, including the fact of a prior conviction—the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime.       `

* * *

Also demonstrating the common-law approach to determining elements was the well-established rule that, if a statute increased the punishment of a common-law crime, whether felony or misdemeanor, based on some fact, then that fact must be charged in the second superceding indictment in order for the court to impose the increased punishment.

Id. at 2368-70.

Petitioner submits that Justices Thomas and Scalia, through this concurring opinion, support a position that any factor—regardless of the statutory penalty—that results in an increased sentence is a factor that must be admitted or proved to a jury beyond a reasonable doubt. "Apprendi does not clearly resolve whether an enhancement which increases a sentence within the statutory range but which does not increase the sentence beyond that range must be proved to the jury." United States v. Meshack, 225 F.3d 556, 576 (5th Cir. 2000). See also United States v. Hishaw, 235 F.3d 565, 577 (10th Cir. 2000). "The principle dissent in Apprendi criticizes the majority opinion for its unclear scope, noting the 'Court's failure to clarify the contours of the constitutional principle underlying its decision.'" Meshack, 225 F.3d at 576, n.17, citing Apprendi, 120 S.Ct. at 2389 (O'Connor, J., dissenting). The Apprendi dissent goes on to say that "'[t]he actual principle underlying the Court's decision may be that any fact (other than

12

prior conviction) that has the effect, in real terms, of increasing the maximum punishment beyond an otherwise applicable range must be submitted to a jury and proved beyond a reasonable doubt." Apprendi, 120 S.Ct. at 2391 (O'Connor, J., dissenting).

"The principle thus would apply * * * to all determinate-sentencing schemes in which the length of a defendant's sentence within the statutory range turns on specific factual determination (e.g., the federal Sentencing Guidelines)." Id. at 2393-94. See also United States v. Mack, 229 F.3d 226, 236-37 (3rd Cir. 2000) (Becker, C.J., concurring) (reviewing Apprendi and noting that "Justice Scalia's concurrence maintained that 'all the facts which must exist in order to subject the defendant to a legally prescribed punishment must be found by the jury'" and that "Justice Breyer, a key figure in the development of the Sentencing Guidelines, lamented that 'the rationale that underlies the Court's rule suggests a principle * * * that, unless restricted, threatens the workability of every criminal justice system (if applied to judges) or threatens efforts to make those systems more uniform, hence more fair'"); United States v. Harris, 2001 U.S. App. LEXIS 1189; 2001 FED App. 0030P (6th Cir.) (Merritt, J., dissenting)("The Apprendi approach seems to me to disfavor the current judicial and prosecutorial practice of not giving notice by indictment of the real crime at issue and of leaving most of the more salient factual disputes for the sentencing hearing, where the burden of proof is the less rigorous 'preponderance of the evidence' standard and the hearsay rules do not apply.").

No one can read the dissent in Almendarez-Torres v. United States, 523 U.S. 224, 258, 118 S.Ct. 1219, 1238 (1998), authored by Justice Scalia and joined in by Justices Stevens, Souter, and Ginsburg ("[T]here is no rational basis for making recidivism an exception."), the concurring opinion of Justice Thomas in Apprendi, 120 S.Ct. at 2379 ("If a fact is by law the basis for

13

imposing or increasing punishment * * * it is an element."), or the case cited above without

concluding that when next faced with the question, the U.S. Supreme Court may well hold that

any fact that increases the penalty for a crime within the prescribed statutory maximum, *including*

*sentencing guideline enhancements*, must be submitted to a jury and proved beyond a reasonable

doubt. Given the recent rapidity of decision making in this area that holding may well come

sooner, rather than later.

Petitioner submits that the principle underlying <u>Apprendi</u> requires that an enhancement

that increases a sentence *within* the statutory range but does not increase the sentence beyond that

range must be proved to the jury beyond a reasonable doubt. An aggravating fact is an element of

the aggravated crime, whether the statutory amount is exceeded or not. A contrary ruling is an

affront to the Constitution, since it would mean that one would know the total number and nature

of the elements of the offense only in the last moments of the case: once sentence has been

imposed. The proper conclusion is that the arbitrary line called the statutory maximum should be

of no consequence in whether the a certain factor is an element of an offense. All enhancements

and upward departures act to increase the offense. Therefore, the *facts* on which these

enhancements and upward departures are based must be proven beyond a reasonable doubt, not

by a preponderance of the evidence. This being the case, the sentencing court errs when it

imposes sentencing enhancements and upward departures based on facts they have only decided

according to a preponderance of evidence standard. This would include the Court's enhancement

of 230 months in the instant case.

C.    **Application to the Petitioner's Case**

14

In the instant case, because the jury did not render a verdict on the issue of each of the severe enhancements, they were improper in light of Apprendi. Accordingly, the issues that were the subjects of the enhancements should have been charged in the indictment, submitted to a jury, and proved beyond a reasonable doubt. Petitioner did not admit the "facts" which formed the basis for the Court's required enhancement and they were never proved beyond a reasonable doubt. Nevertheless, as a result of the enhancements, Petitioner's sentencing range was increased drastically, mandating a sentence that was 20 to 25 years higher under the Guidelines.

The District Court stated that the sentence it imposed was increased by 6 levels under § 2A6.1(b)(1)(involving conduct evidencing intent to carry out threat); 3 levels under § 3A1.2(a)(intended victims of offense were government employees) and; 12 levels under § 3A1.4(a) (promote a federal crime of terrorism). The Petitioner's total sentence was 292 months. Additionally, the Petitioner's Criminal History Category was increased from a Category I to a Category VI. These enhancements were based on facts that had the effect of drastically increasing the penalty for the crime, and were only proven by a preponderance of the evidence. However, the appropriate standard of proof for a factor that results in an increased offense is that the factor must be proven beyond a reasonable doubt. This is an error of constitutional magnitude that is repugnant to the very realms of justice, and cannot stand. Since the sentence was determined using an inappropriate standard, it must be vacated, set aside, or corrected.

The Petitioner received an enhancement under § 3A1.4 because the crime allegedly involved or was *intended* to promote a *federal crime of terrorism*. This term is defined at 18 U.S.C. § 2332b(g). This enhancement drastically increased the both the Petitioner's offense level and Criminal History Category and ultimately increased the Petitioner's potential sentence from

15

two-and-one-half years to over twenty years imprisonment. Despite this drastic increase, the factors resulting in the increase were never submitted in the indictment or proven beyond a reasonable doubt. As a result, the Defendant received approximately a 23-year increase in his sentence based on factors that were merely included in the Petitioner's Presentence Investigation Report for rubber stamp approval by the district court.

It is submitted that such a drastic increase in the Petitioner's sentence without prior notification by way of indictment, or being proven beyond a reasonable doubt is a violation of Due Process.

**CONCLUSION**

For all of these reasons, the Court must vacate, set aside, or correct the Petitioner's sentence.

Respectfully submitted,

Matthew M. Robinson, Esq.
Attorney for Petitioner
11331 Grooms Road, Suite 3000
Cincinnati, Ohio 45242
(513) 381-8033  voice
(513) 381-8043  facsimile
Kentucky BAR # 88750

## VERIFICATION

I, Jack Abbot Grebe, Jr, hereby declares, verifies and states under penalty of perjury that the facts stated in the foregoing motion and memorandum of law are true and correct to the best of his knowledge and belief.

Executed on March _13_, 2002, pursuant to 28 U.S.C. 1746.

Jack Abbot Grebe, Jr.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing motion for relief pursuant to 28 U.S.C. §

2255 and memorandum of law in support of that motion were served, via U.S. mail. this _19_ day

of _March_____, 2002, with sufficient postage to ensure delivery, upon Mervyn

Milton Mosbacker, AUSA, 1036 E. Levee Street, Brownsville, TX 78520.


Matthew M. Robinson, Esq.

"EXHIBIT A"

SUPERSEDING INDICTMENT

United States District Court
Southern District of Texas
FILED

AUG 1 4 1998

Michael N. Milby
Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v.s. | § | |
| | § | CRIMINAL NO.  B  9 8 - 4 1 5 . S/ |
| JOHNIE WISE | § | |
| JACK ABBOTT GREBE, JR. | § | |
| OLIVER DEAN EMIGH | § | |

## S U P E R S E D I N G
## I N D I C T M E N T

THE GRAND JURY CHARGES:

### COUNT 1

From on or about March 24, 1998 to on or about June 30, 1998, in the Southern District of Texas and within the jurisdiction of the Court, Defendants

**JOHNIE WISE,**
**JACK ABBOTT GREBE, JR.,**
and
**OLIVER DEAN EMIGH**

did knowingly and intentionally conspire and agree together and with each other to intentionally use and attempt to use a weapon of mass destruction, namely a biological agent and a weapon involving a disease organism, against a person and persons within the United States, the results of which use would have affected interstate and foreign commerce in violation of Title 18, United States Code, Section 2332a(a)(2)and (c)(2)(C).

### OVERT ACTS

In furtherance of the conspiracy and to effect the objects thereof, the coconspirators knowingly committed the following overt acts:

2[2]
1163

1. On or about  February 20 , 1998, an individual who asked that his identity be protected until time of trial, here after referred to as the "source", was approached by a person who identified himself as an official of the Republic of Texas (ROT).  The "source" was also introduced to OLIVER DEAN EMIGH, who also introduced himself as a member of the ROT.  OLIVER DEAN EMIGH and this other person attempted to recruit the "source" into the ROT.

2. On or about April 29, 1998, the "source" was visited by JOHNIE WISE and JACK ABBOTT GREBE, JR.  Both men claimed to be members of the ROT. These men requested the "source" find the E-mail addresses of several officials of the United States Government.  The following is a list of E-mail addresses requested:

a.  Chairman of the Internal Revenue Service (IRS)
b.  All regional IRS offices (E-mail and fax)
c.  United States Attorney General, Janet Reno
d.  The Director of the Federal Bureau of Investigation (FBI), Louis Freeh
e.  The Director of the Central Intelligence Agency (CIA)
f.  The Director of the United States Drug Enforcement Agency (DEA)
g.  Texas Department of Public Safety
h.  Texas Attorney General
I.  White House, President Clinton

During this meeting JOHNIE WISE and JACK ABBOTT GREBE, JR. informed the "source" of their plans to develop a delivery system for a biological weapon to be used against officials of the United States Government.  Specifically JOHNIE WISE and JACK ABBOTT GREBE, JR. told him of their plan to convert Bic lighters so that the lighters would propel compressed air instead of propane. They said that the converted lighter would be used to infect people with botulism or rabies; that the lighters would have a hypodermic needle glued to the opening of the lighter where a cactus thorn would be inserted; that this thorn would be infected with some type of disease; and that the thorn could then be shot at individuals, thereby infecting them.

3. In or about May, 1998 several versions of a document entitled "Declaration of War" were written by OLIVER DEAN EMIGH.

4. On or about June 1, 1998, JOHNIE WISE and JACK ABBOTT GREBE, JR. provided the "source" with the final draft of the "Declaration of War" written by OLIVER DEAN EMIGH.  This version included a threat to harm federal agents and their families.  JOHNIE WISE and JACK ABBOTT GREBE, JR.  asked the "source" to figure out a way to send threats, via the E-mail, in a way that could not be traced back to them.

464

5. On or about June 12, 1998 in the evening JACK ABBOTT GREBE, JR. came to the "source's" residence from where JACK ABBOTT GREBE, JR. okayed E-mailing the "Declaration of War" to six different federal law enforcement agencies, after which the E-mails were sent out. JACK ABBOTT GREBE, JR. told the "source" to include the Drug Enforcement Administration as a recipient of the E-mail because he believed that they were behind the shooting of "that kid out there in Reddford".

6. On or about June 12, 1998, later that evening, JOHNIE WISE and the "source" had a telephone conversation where JOHNIE WISE asked the "source" whether he thought better of sending the E-mail from the library. JOHNIE WISE also told the "source" that he (WISE) needed to be working on the delivery device.

7. On or about June 24, 1998, JOHNIE WISE and JACK ABBOTT GREBE, JR. told the "source" that the first person they were going to infect with a biological weapon was Judge Migdalia Lopez (a Cameron County Court-at-Law judge). JOHNIE WISE and JACK ABBOTT GREBE, JR. also discussed placing a surveillance on Judge Lopez to find out where she ate breakfast and shopped. JOHNIE WISE spoke of using the rabies disease to infect Judge Lopez. JOHNIE WISE also said that the delivery system made from the lighters was almost complete. A conversation was had between JOHNIE WISE and JACK ABBOTT GREBE, JR. about the best way to produce botulism. JOHNIE WISE and JACK ABBOTT GREBE, JR. agreed that chicken livers, chicken hearts, and green beans with a little dirt would produce the most deadly toxin.

8. On or about June 26, 1998, JOHNIE WISE and JACK ABBOTT GREBE, JR. again met with the "source" in order to send a more specific threatening E-mail message to officials of the United States Government. The messages were sent out that evening with the assistance of JACK ABBOTT GREBE, JR. One of the messages sent read as follows:

Dear Mr. Louis J. Freeh

Your FBI employees and their families have been targeted for destruction by revenge. We the people are extremely mad and will not accept the inequities any longer. Non-tracable (sic), personal delivery systems have been developed to inject bacteria and/or viruses for the purpose of killing, maiming, and causing great suffering. Warn all concerned so that they may protect themselves and be made aware of this threat to themselves and their families. Good Luck!

The above listed message was sent to the directors of several governmental agencies, including President Clinton, Director Louis J. Freeh of the Federal Bureau of Investigation, Director John W. Magaw, Bureau of Alcohol, Tobacco,

*u65*

and Firearms, Director Thomas A. Constantine of the Drug Enforcement Administration, Director Rossotti, Internal Revenue Service, as well as the directors of the United States Secret Service, and the United States Customs service. The text for the message sent to the officials was the same, the only differences being the E-mail addresses to where the threats were sent, and the names of the people and the organizations receiving the threats.

9. On or about June 29, 1998, a conversation was had between the "source" and OLIVER DEAN EMIGH. During this conversation OLIVER DEAN EMIGH spoke about the device that was to be used as a delivery system to infect people, and spoke about the "Declaration of War". OLIVER DEAN EMIGH also told the "source" that a threat should have also been sent to the United States Department of State.

In violation of Title 18, United States Code, Section 2332a(a)(2) and (c)(2)(C).

### Count 2

On or about June 26, 1998, in the Southern District of Texas and within the jurisdiction of the Court, the Defendants

JOHNIE WISE,
JACK ABBOTT GREBE, JR.
and
OLIVER DEAN EMIGH

did knowingly and intentionally threaten to use a weapon of mass destruction, namely a biological agent and a weapon involving a disease organism, against persons within the United States, namely employees of the President of the United States and their families, the results of which use would have affected interstate and foreign commerce.

In violation of Title 18, United States Code, Section 2332a(a)(2) and (c)(2)(C) and Section 2.

466

## Count 3

On or about June 26, 1998, in the Southern District of Texas and within the jurisdiction of the Court, the Defendants

JOHNIE WISE,
JACK ABBOTT GREBE, JR.
and
OLIVER DEAN EMIGH

did knowingly and intentionally threaten to use a weapon of mass destruction, namely a biological agent and a weapon involving a disease organism, against persons within the United States, namely employees of the Bureau of Alcohol, Tobacco, and Firearms and their families, the results of which use would have affected interstate and foreign commerce.

In violation of Title 18, United States Code, Section 2332a(a)(2) and (c)(2)(C) and Section 2.

## Count 4

On or about June 26, 1998, in the Southern District of Texas and within the jurisdiction of the Court, the Defendants

JOHNIE WISE,
JACK ABBOTT GREBE, JR.
and
OLIVER DEAN EMIGH

did knowingly and intentionally threaten to use a weapon of mass destruction, namely a biological agent and a weapon involving a disease organism, against persons within the United States, namely employees of the Federal Bureau of Investigation and their families, the results of which use would have affected interstate and foreign commerce.

In violation of Title 18, United States Code, Section 2332a(a)(2) and (c)(2)(C) and Section 2.

467

<u>Count 5</u>

On or about June 26, 1998, in the Southern District of Texas and within the jurisdiction of the Court, the Defendants

JOHNIE WISE,
JACK ABBOTT GREBE, JR.
and
OLIVER DEAN EMIGH

did knowingly and intentionally threaten to use a weapon of mass destruction, namely a biological agent and a weapon involving a disease organism, against persons within the United States, namely employees of the Drug Enforcement Administration and their families, the results of which use would have affected interstate and foreign commerce.

In violation of Title 18, United States Code, Section 2332a(a)(2) and (c)(2)(C) and Section 2.

<u>Count 6</u>

On or about June 26, 1998, in the Southern District of Texas and within the jurisdiction of the Court, the Defendants

JOHNIE WISE,
JACK ABBOTT GREBE, JR.
and
OLIVER DEAN EMIGH

did knowingly and intentionally threaten to use a weapon of mass destruction, namely a biological agent and a weapon involving a disease organism, against persons within the United States, namely employees of the Internal Revenue Service and their families, the results of which use would have affected interstate and foreign commerce.

In violation of Title 18, United States Code, Section 2332a(a)(2) and (c)(2)(C) and Section 2.

468

<u>Count 7</u>

On or about June 26, 1998, in the Southern District of Texas and within the jurisdiction of the Court, the Defendants

JOHNIE WISE,
JACK ABBOTT GREBE, JR.
and
OLIVER DEAN EMIGH

did knowingly and intentionally threaten to use a weapon of mass destruction, namely a biological agent and a weapon involving a disease organism, against persons within the United States, namely employees of the United States Secret Service and their families, the results of which use would have affected interstate and foreign commerce.

In violation of Title 18, United States Code, Section 2332a(a)(2) and (c)(2)(C) and Section 2.

<u>Count 8</u>

On or about June 26, 1998, in the Southern District of Texas and within the jurisdiction of the Court, the Defendants

JOHNIE WISE,
JACK ABBOTT GREBE, JR.
and
OLIVER DEAN EMIGH

did knowingly and intentionally threaten to use a weapon of mass destruction, namely a biological agent and a weapon involving a disease organism, against persons within the United States, namely employees of the United States Customs Service and their families, the results of which use would have affected interstate and foreign commerce.

469

In violation of Title 18, United States Code, Section 2332a(a)(2) and (c)(2)(C) and Section 2.

A TRUE BILL:

_____

FOREPERSON OF THE GRAND JURY

JAMES DeATLEY
UNITED STATES ATTORNEY

_____

MERVYN M. MOSBACKER
Assistant United States Attorney

TRUE COPY I CERTIFY
ATTEST:
MICHAEL N. MILBY, Clerk of Court
By _____
Deputy Clerk

470

"EXHIBIT B"

PRESENTENCE INVESTIGATION REPORT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | PRESENTENCE INVESTIGATION REPORT |
| | § | |
| | § | Docket No.  B-98-00415-02-S1 |
| JACK ABBOTT GREBE, JR. | | |

| | |
|---|---|
| **Prepared For:** | Honorable  Hilda G. Tagle<br>United States District Judge |
| **Prepared By:** | Richard Longoria<br>Senior U. S. Probation Officer<br>Brownsville, Texas<br>(956) 548-2522 |

This report is a confidential court document, and the cou~
in~... u.  ~...  ...  .... .. ... this copy is ~... t~
the ...  ... u..  ... ... in performing statutor~
...  and it must be returned to the court.

| | |
|---|---|
| **Assistant U.S. Attorney**<br>Mervyn Milton Mosbacker<br>1036 E. Levee Street<br>Brownsville, Texas 78520<br>(956) 548-2554 | **Defense Counsel**<br>Daniel Herink<br>P.O. Box 2155<br>Brownsville, Texas 78522<br>(956) 542-7441 |

| | |
|---|---|
| **Sentence Date:** | January 29, 1999 at 9:00 a.m. |
| **Offense:** | <u>Counts 5 and 6:</u> (10/29/98)  Threatening to use a weapon of mass destruction,  in violation of 18 U.S.C. §§ 2332a(a)(2), 2332a(c)(2)(C) and 2.  Life imprisonment and/or a $250,000.00 fine plus up to five (5) years supervised release and a $100.00 special assessment as to each count. |
| **Release Status:** | In custody without bond since 07/01/98 (approximately 213 days in custody). |
| **Detainers:** | None. |
| **Codefendants:** | Johnie Wise            B-98-00415-01-S1<br>Oliver Dean Emigh     B-98-00415-03-S1 |
| **Related Cases:** | None known. |

| | |
|---|---|
| **Date Report Prepared:**   12/12/98 | **Date Report Revised:**   01/20/99 |

**Identifying Data:**

| | |
|---|---|
| **Date of Birth:** | 09/26/54 |
| **Age:** | 44 |
| **Race:** | White |
| **Sex:** | Male |
| | |
| **SSN No:** | 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 |
| **FBI No:** | Not available |
| **USM No:** | 82283-079 |
| **State ID No:** | Not available |
| | |
| **U.S. INS No.** | None |
| | |
| **Education:** | 13 years (SC) |
| **Dependents:** | None |
| **Citizenship:** | U.S. |
| | |
| **Legal Address:** | c/o 2209 West Kennedy |
| | Harlingen, Texas 78575 |
| | |
| **Aliases:** | None |

## PART A.  THE OFFENSE

### Charges and Convictions

1.  On July 21, 1998, a federal grand jury in Brownsville, Texas returned an eight-count indictment against Johnie Wise, **Jack Abbott Grebe, Jr.** and Oliver Dean Emigh.  On August 4, 1998, a superceding indictment was filed.  It charges as follows:

2.  **Count 1:** Conspiracy to use a weapon of mass destruction against persons within the United States, the results of which affected interstate and foreign commerce, in violation of 18 U.S.C. §§ 2332a(a)(2) and 2332a(c)(2)(C).

    *Two statutes*

3.  **Counts 2 - 8:** Threatening to use a weapon of mass destruction, in violation of 18 U.S.C. §§ 2332a(a)(2), 2332a(c)(2)(C) and 2.

    *Two statutes*

4.  All defendants are named in each of the eight (8) counts.

5.  On October 29, 1998, Johnie Wise and **Jack Abbott Grebe, Jr.** were found guilty by jury verdict as to counts five (5) and six (6) and not guilty on all other counts in the superceding indictment.  Oliver Dean Emigh was found not guilty as to all counts in the indictment.

### The Offense Conduct

6.  The following offense conduct was generated from trial testimony and supplemented with Federal Bureau of Investigation (FBI) reports of investigation.

7.  In early March, 1998, John Cain went to the Bargain Barn in Harlingen, Texas with his wife and engaged in conversation with an employee, Oliver Dean Emigh.  Cain and his wife looked around the business and before leaving Cain spoke with John Ocie Roberts, owner of the Bargain Barn.  Cain informed Roberts he contracted himself out to do computer work and both men spoke about Internet service providers and a database.  Roberts informed Cain he was a citizen of the Republic of Texas (ROT) and often needed documents typed due to various court battles around the state.  After a short conversation, Cain and his spouse departed.

8.  The following day, Cain returned believing he could generate computer-related business from Roberts and the ROT.  The two (2) men spoke for approximately four (4) hours and Cain also met Johnie Wise at the Bargain Barn that day.  Cain and Roberts spoke in detail about different types of documents and databases that would benefit Roberts and the ROT.  Cain departed the Bargain Barn and went to the FBI's Resident Office in Brownsville, Texas, the following day.  He informed agents of his conversation with Roberts and added he did not know enough about the ROT.  He informed the FBI he wanted to be sure what he was doing was safe.  FBI agents informed Cain that based upon the information he provided them, it was fine for Cain to work with the ROT because members of the ROT had the right to think whatever they wanted.  However, agents warned Cain not to do anything illegal.

3

9.    Thereafter, Cain proceeded to perform a significant amount of word processing work for Roberts and the ROT. On March 17, 1998, Cain contacted the FBI after Roberts asked him if he (Cain) could check through the National Crime Information Center (NCIC) to see if two (2) ROT members had outstanding arrest warrants. Roberts provided the names, dates of birth and social security numbers of the individuals to be queried. Cain informed that he advised Roberts it was illegal to obtain NCIC information, but Roberts stated he did not care and just wanted it done. Cain also advised FBI agents Roberts invited him to attend ROT meetings at a truck stop in Combes, Texas, and to attend a general council meeting in Conroe, Texas, on March 28, 1998. Cain attended the meeting of the ROT General Council and reported back to the FBI on April 1, 1998. Among other things, Cain advised the FBI that Roberts had nominated him to be his Undersecretary for Trade and Commerce in the ROT.

10.   At the local meetings of the ROT, Cain met **Jack Abbott Grebe, Jr.** Cain testified that the ROT meetings involved the struggle of the citizens of the Republic of Texas who wanted to establish a republic rather than a state. **Grebe** and Wise began to frequent Cain's home for word processing and copies. On April 29, 1998, **Grebe** and Wise approached Cain at his home and asked Cain if he could find E-Mail addresses for government agencies including the Chairman of the Internal Revenue Service (IRS), all regional IRS offices, U. S. Attorney General Janet Reno, FBI Director Louis Freeh, CIA Director, DEA Administrator, Texas Department of Public Safety and Texas Attorney General. During this meeting, the conversations turned to the taking of prisoners. Wise informed Cain that the best way to take a prisoner is to not let the person know he is a prisoner. Wise informed this could be done by using a cactus thorn which is bio gradable and not traceable. The thorn could be coated with a poison to cause a slow death. Wise informed that a slow death was preferable to instant death. Wise asked Cain if it were possible to leave e-mail messages on the Internet without leaving a trace. Cain related he believed it was possible through the anonymizer web site or through other methods.

11.   Both men left Cain's home but continued to visit Cain daily. **Grebe** told Cain he was upset at how long the change of power was taking and Wise agreed. According to Cain, they both wanted forcible removable and wanted to go to war. Through the course of the daily interaction, discussions changed and conversation started to center on how to go to war and terrorize government officials. Both **Grebe** and Wise were very opinionated on the matter and felt it was time to go to war. **Grebe** had a truck washing business he wanted to go into and wanted to start receiving money from the ROT. Wise informed it was important not to take credit for what they were doing. Discussions began to center around a document written by Oliver Dean Emigh which was solicited from Emigh by Wise.

12.   On May 20, 1998, Cain informed FBI agents that **Grebe** and Wise were visiting him on a daily basis and were discussing their plans to threaten federal law enforcement agents. Cain informed the FBI that Wise described a delivery system he planned to build as a BIC lighter modified to propel air instead of propane. Utilizing super glue to attach a hyper dermic needle to the opening of the lighter, Wise would be able to place a cactus thorn coated with an infectious disease which could be shot at an individual. Cain informed the FBI that Wise and **Grebe** spoke about using HIV, Anthrax, the rabies virus or botulism as the infectious

4

diseases they would use in the delivery system. Wise planned to mail a prototype of the delivery system to the United States from Mexico. Both **Grebe** and Wise proposed to pack the device with some type of illegal drugs in hopes it would be stopped by the Postal Service or U. S. Customs by a drug detection dog. The plan also included placing a threatening letter in the package similar to the one they planned on e-mailing. This would prove their threats were credible. Cain provided the FBI with the drafts of messages **Grebe** and Wise wanted e-mailed.

13. On June 1, 1998, Wise and **Grebe** provided Cain with the final draft of the "declaration of war" written by Emigh. Again, Wise and **Grebe** asked Cain to figure out a way to send the threats via e-mail which was not traceable. Cain proposed using the public library in Brownsville, Texas; however, the FBI did not approve and asked Cain if he was willing to cooperate fully in this case. When Cain agreed, the FBI authorized sending of the "Declaration of War" with the stipulation that it be sent from Cain's home.

14. On June 12, 1998, **Grebe** traveled to Cain's residence and authorized Cain to e-mail the final draft of the "declaration of war" to six (6) federal law enforcement agencies. **Grebe** instructed Cain to include the Drug Enforcement Administration (DEA) because the DEA was behind the shooting of a teenager in the border town of Redford, Texas. Cain proceeded to send the e-mail messages and later that day telephonically advised Wise the e-mails had been sent. Wise informed Cain he (Wise) needed to be working on the delivery device. Both conversations were electronically monitored by the FBI.

15. On June 24, 1998, Wise and **Grebe** met with Cain to discuss the e-mails sent out on June 12, 1998. Wise and **Grebe** discussed the need of expediting their plan and discussed who their first target would be. **Grebe** decided to target Cameron County Court at Law Judge Migdalia Lopez, because Lopez would not allow defendants to represent themselves in her court. Different ways were discussed on how to kill her and Wise suggested that she be infected with rabies. He also suggested she be followed and studied to determine her daily habits. **Grebe** suggested the IRS as a follow-up target to Judge Lopez. Wise and **Grebe** discussed following government employees and hurting their families. Wise and **Grebe** also discussed the best method to produce botulism and concluded that chicken livers, chicken hearts, and green beans with dirt would be most lethal. Wise noted that he had already purchased the items necessary to make the delivery device. These discussions were electronically monitored by FBI agents.

16. The FBI shared the information concerning the threat against the life of Judge Lopez with the Assistant United States Attorney's Office (AUSA) in Brownsville. Upon learning of the threat, the AUSA wanted the defendants arrested immediately. FBI agents discussed their investigative plan with the AUSA who agreed to delay the arrests to give the FBI an extra week to conduct video surveillance of the defendants.

17. On June 26, 1998, Wise and **Grebe** traveled to Cain's home and instructed Cain to send threatening e-mail messages to employees and families of: the President of the United States; Bureau of Alcohol, Tobacco and Firearms; Federal Bureau of Investigation; Drug

5

Enforcement Administration; Internal Revenue Service; U. S. Secret Service; and U. S. Customs Service. **Grebe** insisted on sending the messages which were all the same with the exception of the salutation and the designated agency. The message was as follows:

> Dear (Designated Agency)
>
> Your (Designated Agency) employees and their families have been targeted for destruction by revenge. We the people are extremely mad and will not accept the inequities any longer. Non-tracable (sic), personal delivery systems have been developed to inject bacteria and/or viruses for the purpose of killing, maiming, and causing great suffering. Warn all concerned so that they may protect themselves and be made aware of this threat to themselves and their family. Good Luck!

18.   The sending of these e-mails was electronically monitored by the FBI utilizing hidden video equipment. The threat had an ultimate purpose of scaring government agents so that they would not do their jobs.

19.   On June 29, 1998, the FBI directed Cain to meet with Oliver Dean Emigh to ascertain what Emigh knew. Cain met with Emigh outside his place of employment (Bargain Barn). Cain and Emigh basically spoke about a book Emigh wanted to publish.

20.   On June 30, 1998, U. S. Magistrate Judge John William Black issued arrest warrants for Grebe, Wise and Emigh and also issued search warrants for their residences. On July 1, 1998, FBI agents executed the arrest and search warrants and placed Wise, **Grebe** and Emigh under arrest. No biological agents were located during the searches. At trial, the case agent testified that if it were not for the FBI's arrest of the defendants in this case, the threats were to continue.

## RELEVANT CONDUCT CONSIDERATIONS

21.   Each defendant's relevant conduct exposure involved threats to injure the employees and families of government agents. A total of seven threats were e-mailed to several agencies, however, pursuant to the relevant conduct provisions of U.S.S.G. § 1B1.3(a)(1)(A) and (B), only the threats sent to the IRS and DEA (Counts 5 and 6) are considered for purposes of determining the offense level. Defendants **Grebe** and Wise expressed a strong desire to carry out the threats utilizing a variety of toxins all which are weapons of mass destruction as defined by federal statute. Moreover, a clever delivery device was conceived by Wise. Utilizing the air-powered delivery system, toxins could be injected into targets utilizing a cactus thorn. The thorn was key to the system because it is biodegradable making it untraceable. The object of the threat(s) is also considered relevant conduct under U.S.S.G. §1B1.3(a)(4).

Victim Impact

22.  The FBI arrested the defendant before any injury was sustained by any of the victims in this case.

Adjustment for Obstruction of Justice

23.  The probation officer has no information to suggest that the defendant impeded or obstructed justice.

Adjustment for Acceptance of Responsibility

24.  On advise of counsel, the defendant remained silent concerning the instant offense.

Offense Level Computations

25.  Because each count of conviction represents separate victims, each count is a separate group and the offense level is determined by using the multiple count grouping rule in Chapter 3, Part D of the Sentencing Guidelines.  The statutory index for violation of 18 U.S.C. §§ 2332a(a)(2) and (c)(2)(C) reflects several possible guidelines to be applied to the instant offenses of conviction.  However, upon review of the acts committed, it does not appear that any of the listed guidelines appropriately address the offense conduct in this case.  As such, the probation officer relies on the guidance in U.S.S.G.  Appendix A - Statutory Index Introduction.  If more than one guideline section is referenced for the particular statute, use the guideline most appropriate for the nature of the offense conduct of which the defendant was convicted.  If, in any atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted.  (U.S.S.G. § 1B1.2)  The probation officer has determined that U.S.S.G. § 2A6.1 (Threatening or Harassing Communications) is the most analogous guideline in this case.

26.  The 1998 edition of the Guidelines Manual has been used in this case.  There are no ex post facto considerations.

Count 5 - Threatening to use a weapon of mass destruction.

27.  **Base Offense Level:** The guideline for violation of 18 U.S.C. § 2332a(a)(2) and (c)(2)(C) is found in U.S.S.G. § 2A6.1 and calls for a base offense level of twelve.                    12

28.  **Specific Offense Characteristic:** Because the instant offense involved conduct evidencing an intent to carry out the threat, U.S.S.G. § 2A6.1(b)(1) requires a six (6) level increase.
                                                                                                                +6

7

29.  **Victim-Related Adjustments:** The intended victims of the instant offense were government employees and members of their families and the offense of conviction was motivated by such status. Pursuant to U.S.S.G. § 3A1.2(a), a three (3) level increase is applicable.          +3

30.  The instant offense of conviction that was intended to promote a federal crime of terrorism as defined at 18 U.S.C. § 2332b(g). Pursuant to U.S.S.G. § 3A1.4(a), twelve (12) levels are added, but if the resulting offense level is less than thirty-two (32), increase to level thirty-two (32).          +12

31.  **Adjustments for Role in the Offense:** None.          0

32.  **Adjustment for Obstruction of Justice:** None.          0

33.  **Adjusted Offense Level (Subtotal):**          33

Count 6 -- Threatening to use a weapon of mass destruction.

34.  **Base Offense Level:** The guideline for violation of 18 U.S.C. § 2332a(a)(2) and (c)(2)(C) is found in U.S.S.G. § 2A6.1 and calls for a base offense level of twelve (12).          12

35.  **Specific Offense Characteristic:** Because the instant offense involved conduct evidencing an intent to carry out the threat, U.S.S.G. § 2A6.1(b)(1) requires a six (6) level increase.          +6

36.  **Victim-Related Adjustments:** The intended victims of the instant offense were government employees and members of their families and the offense of conviction was motivated by such status. Pursuant to U.S.S.G. § 3A1.2(a), a three (3) level increase is applicable.          +3

37.  The instant offense of conviction is an offense that was intended to promote a federal crime of terrorism as defined at 18 U.S.C. § 2332b(g). Pursuant to U.S.S.G. § 3A1.4(a), twelve (12) levels are added, but if the resulting offense level is less than thirty-two (32), an increase to level thirty-two (32) is mandated.          +12

*[handwritten note: Out of text your office is already defined by your statute 3A1.4 doesn't apply]*

38.  **Adjustments for Role in the Offense:** None.          0

39.  **Adjustment for Obstruction of Justice:** None.          0

40.  **Adjusted Offense Level (Subtotal):**          33

Multiple-Count Adjustment (See section 3D1.4)

| | | Units |
|---|---|---|
| 41. Adjusted Offense Level for Count 5 | 33 | 1 |
| 42. Adjusted Offense Level for Count 6 | 33 | 1 |
| 43. Total Number of Units | | 2 |
| 44. Greater Adjusted Offense Level | 33 | |
| 45. Increase in Offense Level | 2 | |

8

46.    **Combined Adjusted Offense Level:**                                                  35

47.    **Adjustment for Acceptance of Responsibility:** The defendant put the government to its burden of proof at trial and upon advice of counsel, elected to remain silent concerning the instant offense when interviewed by the probation officer. Henceforth, he is not entitled to an adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.                0

48.    **Total Offense Level:**                                                              35

49.    **Chapter Four Enhancements:** None.                                                   0

50.    **Total Offense Level:**                                                              35

# PART B.  DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudications

51.    None.

### Adult Criminal Convictions

52.    None.

### Criminal History Computation

53.    Because the offense meets criteria set forth in U.S.S.G. § 3A1.4, the defendant's criminal history category is VI.

### Pending Charges

54.    None known.

See pg 27
used USSG
1995 USSG
manual

# PART C.  OFFENDER CHARACTERISTICS

### Personal and Family Data

55.    Jack Abbott Grebe, Jr. was born in the small township of Tyrone, Pennsylvania on September 26, 1954. He is one of five (5) children born to the marital union of Jack Abbott and Mildred Louise Peters. The defendant's father was a physician and his mother was a registered nurse. They combined their talents to operate a family medical practice. The defendant had the presence of both parents during his formative years. Abbott's father died in 1974 at age 53 of a stroke and his mother died in 1984 at age 62.

56.    The defendant reported his siblings and their location are: William (Pennsylvania), Judith Barrett (location undisclosed), Patricia (Virginia), and Mary Lee Eisenberg (Pennsylvania). Grebe became disturbed when questioned about his siblings. He attributed his reaction to a

fight over his parents' estate. Grebe noted that he had a falling out with his siblings during the settlement of the estate because they were greedy. He informed he relinquished his share of the estate and cut off contact with his siblings. He wished to provide no further information on the matter.

57.   Shortly after graduating from high school, the defendant married Debra Myers in Tyrone, Pennsylvania in 1974. One child, Rachel Grebe, age 23, was born to the relationship. Grebe explained that in 1977 he enlisted in the U.S. Air Force. When he completed basic training, he returned to Tyrone to pick up his wife and child and take them to his duty station. However, his wife refused to go with him and he later found out she was seeing another man. Grebe got an early discharge from the Air Force to concentrate on his legal battle with his wife to gain custody of their child. According to Grebe, the marriage ended in divorce in 1979 and he eventually was awarded custody of his daughter. The defendant stated that his spouse was pregnant with another man's child at the time of their divorce. He noted that he raised his daughter since she was four (4) years of age and his daughter presently works as a travel consultant in Malvern, Pennsylvania. Grebe lived in Pennsylvania until 1994 when he began to travel in his recreational vehicle.

58.   In 1993, the defendant met Nora Smith through a mutual acquaintance in Pennsylvania. The defendant began to date Smith who was employed as a traveling nurse. Her occupation brought her to Harlingen, Texas and the defendant followed her. They moved in together and the relationship developed in a positive fashion. Smith was later selected as the site director for the American Red Cross in Harlingen, Texas. In April, 1998, Smith suggested that they marry and Grebe refused. Their living arrangement terminated thereafter but they continued to be friends. Grebe frequently visited Smith and her grandmother at their apartment in San Benito, Texas.

## Physical Condition

59.   The defendant stands five (5) feet eleven (11) inches tall, weighs 159 pounds, has hazel eyes and blonde hair. He has a tattoo of a devil on his chest and scars on his abdomen from hernia and appendix operations. The defendant reported he suffers severe headaches from hypertension and takes medication for his condition. He claimed that jail personnel do not provide him with his medication in the required time intervals and this worsens his condition. Prior to his arrest, he walked five (5) miles per day to help control his hypertension.

## Mental and Emotional Health

60.   The defendant informed he has never been examined nor treated by any physician or mental health specialist for any mental and/or emotional disorders. In the interview, he expressed pointed distrust at the law enforcement community and judicial system.

10

Substance Abuse

61. The defendant admitted to social consumption of alcohol. He informed he experimented with marihuana on one occasion in high school but has never used or experimented with any other illicit substances. No information to the contrary was identified.

Education and Vocational Skills

62. The defendant graduated from Tyrone area high school in 1972. Thereafter, he enrolled in Juniata College in Huntington, Pennsylvania where he was in a pre-med course of study. Grebe related he quit school after one year on his father's advice to avoid the medical field. He moved to Washington, D.C. afterwards and worked as a construction laborer for approximately one (1) year before returning to Juniata College for one (1) more semester. Grebe reported no other academic or vocational training/skills.

Employment Record

63. The defendant has been unemployed since 1996. From 1980 to 1990 he owned and operated the Foxfire Bar and Restaurant located outside of Tyrone, Pennsylvania. He informed he closed the business in 1990 due to a variety of reasons including declining business, a building which was not up to code, and escalating liquor taxes. He took a year off from work and landed employment in 1991 with Tyrone Milling as a seasonal worker performing a variety of tasks such as grain and insecticide management. In 1991, the defendant also worked part time as a truck driver for Morgan Drive Away headquartered in Elkhart, Indiana. Grebe continued his seasonal work at Tyrone Milling in 1992 where after he worked for one month as a truck driver for Charles I. McClellan Trucking in Tyrone. The defendant's seasonal employment with Tyrone Milling continued in 1994 and 1995. Other intermittent work included temporary positions with CRH Catering Company (1994) in Connellsville, Pennsylvania and as a truck driver for East Loop Sand Company (1995) in Hollidausburg, Pennsylvania.

64. Grebe enlisted in the U.S. Air Force in January, 1977. He was trained as a medical materials specialist (purchasing agent) and stationed in Las Vegas, Nevada until April, 1978 when he was honorably discharged after submitting a discharge packet asking for a discharge to handle a legal battle to gain custody of his daughter.

Financial Condition: Ability to Pay

65. The defendant declined to provide any financial information stating that the information he provided could potentially prove counter productive in an anticipated civil law suit. Grebe did not elaborate. He was provided with and asked to consider completing a financial statement after conferring with his attorney.

66. According to information gleaned from the files of U.S. Pretrial Services, the defendant's assets include a motor home valued at $27,000.00, automobiles valued at $3,000.00 and a

cash management account with a $2,000.00 balance.  Liabilities include $1,300.00 in unsecured debt relating to credit cards.

67.    Pursuant to U.S.S.G. 5E1.2(a), the Court shall impose a fine in all cases.  Pursuant to U.S.S.G. 5E1.2(d), in determining the amount of the fine, the Court shall consider the need for the combined sentence to reflect the seriousness of the offense, the defendant's ability to pay (including the ability to pay over a period of time), and any burden the fine places on the defendant and his dependents relative to alternative punishments.

## PART D.  SENTENCING OPTIONS

### Custody

68.    **Statutory Provisions:** The maximum term of imprisonment for Count five (5) is life imprisonment, pursuant to 18 U.S.C. § 2332a(a)(2).  The maximum term of imprisonment for Count 6 is life imprisonment, pursuant to 18 U.S.C. § 2332a(a)(2).



69.    **Guideline Provisions:** Based on a total offense level of thirty-five (35) and a criminal history category of VI, the guideline range for imprisonment is two hundred and ninety two (292) three hundred and sixty five (365) months to life imprisonment and is found in Zone D of the Sentencing Table.  U.S.S.G. Chapter 5, Part A.

70.    If the applicable guideline range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment, pursuant to U.S.S.G. § 5C1.1(f).

### Impact of Plea Agreement

71.    The defendant was convicted by jury verdict and therefore there was no plea bargain agreement entered into in this case.  If the defendant had been found guilty on all counts in the indictment, the grouping rules of Chapter 3 would have been applied and the defendant's offense level would have been forty-four (44) and the guideline range would have been life imprisonment.  The minimum guideline fine range would have increased by $5,000.00 to $25,000.00.

### Supervised Release

72.    **Statutory Provisions:** If a term of imprisonment is imposed for Count five (5), a term of supervised release of not more than five (5) years may also be imposed, pursuant to 18 U.S.C. § 3583(b)(1).

73.    If a term of imprisonment is imposed for Count six (6), a term of supervised release of not more than five (5) years may also be imposed, pursuant to 18 U.S.C. § 3583(b)(1).  Such terms of supervised release run concurrently, pursuant to 18 U.S.C. § 3624(e).

74.    **Guideline Provisions:** The guideline range for a term of supervised release is at least three years but not more than five years, pursuant to U.S.S.G. § 5D1.2 (a)(1).  If a sentence of

imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to U.S.S.G. § 5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year, pursuant to U.S.S.G. § 5D1.1(a).

Probation

75.    **Statutory Provisions:** The defendant is not eligible for probation because the instant offenses area Class A felonies, pursuant to 18 U.S.C. § 3561(a)(1).

76.    **Guideline Provisions** The defendant is not eligible for probation because the instant offenses are Class A felonies, pursuant to U.S.S.G. § 5B1.1(b)(1).

Fines

77.    **Statutory Provisions:** The maximum fine as to each count of conviction is $250,000.00, pursuant to 18 U.S.C. § 3571. A special assessment of $100.00 is mandatory, pursuant to 18 U.S.C. § 3013.

78.    Pursuant to 18 U.S.C. § 3612(f)(1), a defendant shall pay interest on any fine of more than $2,500, unless the fine is paid in full before the 25th day after the date of judgement. If the Court determines that the defendant does not have the ability to pay interest, 18 U.S.C. § 3612(f)(3) authorizes the Court to waive the required for interest; limit the total interest payable to a specific dollar amount; or limit the length of the period during which interest accrues. If interest is not waived by the Court at the time of sentencing, the Attorney General may subsequently waive all or part of any interest that has accrued if, as determined by the Attorney General, reasonable efforts to collect the interest are not likely to be effective, pursuant to 18 U.S.C. § 3612(h).

79.    **Guideline Provisions:** The fine range for the instant case   is from $20,000.00 to $200,000.00, pursuant to U.S.S.G. § 5E1.2(c)(3).

Restitution

80.    **Statutory Provisions:** Restitution is not an issue in this case.

**PART E.  FACTORS THAT MAY WARRANT DEPARTURE**

*Information in this section does not necessarily constitute a recommendation for departure.*

81.    The e-mails threatening the use of weapons of mass destruction sent on June 26, 1998 were directed at thousands of government employees and their families. The guideline at U.S.S.G. § 2A6.1 does not take into consideration the vast numbers of potential victims threatened by the defendant's conduct. The court may wish to consider this point when deciding at which point within the guideline range to sentence the defendant or whether an upward departure is warranted.

13

Respectfully submitted,

LOUIS G BREWSTER, Chief
U. S. Probation Officer


By:  _____
Richard Longoria
Senior U.S. Probation Officer
RL/rl for nma


Approved:


Linda Wise Marin, Supervising
U.S. Probation Officer

Date: 12/16/98

Revised: 01/19/99

14

"EXHIBIT C"

OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 0 4 1999

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| V. | § | CASE NO. B-98-415 |
| | § | |
| OLIVER DEAN EMIGH, | § | |
| JACK ABBOTT GREBE JR., and | § | |
| JOHNIE WISE | § | |

**DEFENDANT JACK ABBOTT GREBE, JR.'S OBJECTIONS
TO THE PRESENTENCE INVESTIGATION REPORT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Defendant Jack Abbott Grebe, Jr. files these objections to the Presentence
Investigation Report and shows the Court as follows:

**I.
Introduction**

The jury acquitted Defendant Grebe of 6 of the 8 counts charged in the
indictment. Defendant Grebe, however, was convicted of sending threats to the
IRS and DEA. Defendant Grebe agrees with the Government that the two counts
upon which he was convicted should be analyzed as a "threatening or harassing
communication," which is a Level 12 offense carrying a term of 10-16 months.
However, the Government is attempting to pile on numerous extreme adjustments
that increase the possible sentence range from a matter of months to a possible
sentence of 30 years to life. A close analysis of the adjustments urged by the
Government indicate that they do not apply to this case.

The PSI was drafted in an extremely biased fashion in a blatant attempt to
recommend the highest possible sentence. The author clearly wrote the report
with blinders on, failing to include mitigating facts and evidence and ignoring
every possible argument that would indicate that the suggested adjustments do

not apply. Incredibly, the PSI seems to suggest that the Court should impose a sentence at the high end of the recommended 30 years to life range. PSI at page 14, ¶ 83.

The conduct for which Defendant Grebe was convicted was simply written speech -- sending threatening communications. The Government's case relied heavily upon the testimony of its paid information, John Cain, which was shown to be highly untrustworthy. In fact, the Court submitted an entrapment instruction to the jury, which may have been the bases for Defendant Grebe's acquittal on the other counts. The Government introduced no evidence that Defendant Grebe had any intent to carry out the threats or that it would even have been scientifically possible to carry out the threats. These circumstances are clearly outside the heartland of the Sentencing Guidelines and do not warrant a sentence of 30 years to life. The Court should view this offense as a Level 12 and impose an appropriate sentence within that range.

**II.**
**Objections To "The Offense Conduct" Section Of The PSI**

Defendant Grebe objects to the following matters included in "The Offense Conduct" section of the PSI (pages 3--20, ¶¶ 6--20):

1.    Defendant Grebe hereby places the Government to its burden of proof on each and every fact stated in the PSI. The majority of the facts stated in the report are based upon the unsubstantiated testimony of the Government's paid information, John Cain. During the trial, his testimony was shown to be unreliable and false. Numerous inconsistencies existed in his testimony. Cain demonstrably gave false testimony on many matters, including his past employment. Cain's father and ex-wife testified that he was unreliable and a dishonest person. The Government paid thousands of dollars to Cain for his assistance in the case. Surprisingly, none of these facts are included in the PSI.

The jury clearly rejected Cain's testimony, acquitting Defendant Grebe on 6 of the 8 counts. Accordingly, the Government has not met its burden of proof by merely relying upon Cain's testimony in connection with the facts stated in paragraphs 6-20.

2.     The PSI includes references to conduct of and statements made by John Osie Roberts. Defendant Grebe objects to the Government referring to such conduct and statements allegedly committed by some third party which cannot be legally attributable to Defendant Grebe. On this basis, Defendant Grebe objects to paragraphs 7, 8, and 9, their inclusion in the PSI, and any matter stated in those paragraphs as factors to be considered by the Court in imposing a sentence.

3.     The PSI includes references to conduct or statements made by Johnie Wise or Oliver Emigh. However, Defendant Grebe was acquitted on the charge of conspiracy. Defendant Grebe objects to the Government referring to conduct allegedly committed other defendants which cannot be legally attributable to Defendant Grebe. On this basis, Defendant Grebe objects to the following:   (a) the last 7 sentences of paragraph 10; (b) the last 2 sentences of paragraph 11; and (c) those portions of paragraph 12 that refer to statements and conduct of Wise.

4.     Defendant Grebe objects to paragraph 10 in its entirety because the allegations therein are based solely upon the unreliable testimony of John Cain. Accordingly, the Government has not meet its burden of proof with respect to the matters stated in paragraph 10.

5.     Defendant Grebe objects to paragraph 11 in its entirety because the allegations therein are based solely upon the unreliable testimony of John Cain. Accordingly, the Government has not meet its burden of proof with respect to the matters stated in paragraph 11.

6.    Defendant Grebe objects to paragraph 12 in its entirety because the allegations therein are based solely upon the unreliable testimony of John Cain. Accordingly, the Government has not meet its burden of proof with respect to the matters stated in paragraph 12. Defendant Grebe further objects to paragraph 12 because it misstates and mischaracterizes the evidence presented at trial. John Cain testified, in fact, that he could not remember who suggested the mailing of the "delivery system" from the United States to Mexico, and that, in fact, he may have suggested it.

7.    Defendant Grebe objects to paragraph 13 in its entirety because the allegations therein are based solely upon the unreliable testimony of John Cain. Accordingly, the Government has not meet its burden of proof with respect to the matters stated in paragraph 13.

8.    Defendant Grebe objects to the following contained in paragraph 14:

> Grebe instructed Cain to include the Drug Enforcement Administration (DEA) because the DEA was behind the shooting of a teenager in the border town of Redford, Texas.

This is a misstatement and mischaracterization of the evidence. In fact, the FBI's surveillance tapes conclusively show that Cain suggested to Defendant Grebe that the "Declaration of War" be sent to DEA and the Secret Service.

9.    Defendant Grebe objects to the allegations contained paragraph 15, which allege that Defendant Grebe was involved in a plot to kill Judge Migdalia Lopez. Defendant Grebe was never charged with this alleged conduct. In addition, other than the unreliable testimony of Cain, there was no evidence to substantiate these allegations. Indeed, the Government's surveillance tapes indicate that Grebe had done nothing in this regard. Defendant Grebe further objects to the allegation contained in paragraph 15 that he "suggested the IRS as a follow-up target to Judge Lopez." No such evidence was presented at trial.

Defendant Grebe further objects to the allegation contained in paragraph 15 that "these discussion [the allegations contained in paragraph 15] were electronically monitored by FBI agents." In fact, none of the matters stated in paragraph 15 are included on any surveillance tapes. The Government has failed to meet its burden of proof on these allegations. Accordingly, they should not be included in the PSI or considered in sentencing Defendant Grebe.

10.    Defendant Grebe objects to the allegations in paragraph 17 because Defendant Grebe was acquitted of all threat counts, except for the alleged threats sent to the DEA and IRS. The government has not meet its burden of proving that Defendant Grebe sent the other threats as alleged. Accordingly, the Court should not consider those allegations. In addition, Defendant Grebe objects to the following statement: "Grebe insisted on sending the messages . . ." There was no evidence presented that Defendant Grebe insisted upon the threats being sent. In fact, the Government's surveillance tapes showed that Cain was the instigator and that Cain prodded and prompted Defendant Grebe to agree to send the e-mails.

11.    Defendant Grebe objects to the following allegation contained in paragraph 18: "The threat had an ultimate purpose of scaring government agents so that they would not do their jobs." There was no credible evidence of this finding introduced at trial.

12.    Defendant Grebe objects to the PSI because it fails to include numerous mitigating facts and evidence which indicate that Defendant Grebe was not guilty of the offense for which he was acquitted.

First, the PSI does not mention the extensive role played by John Cain in this offense. In fact, without Cain's involvement the threats would have never been sent. The threats were actually sent by Cain, on his computer, at his house. Cain obtained the e-mail addresses. There was no evidence presented that any of

the Defendants had the computer knowledge or necessary equipment to send the e-mails.

Second, none of the evidence indicating that Defendant Grebe was entrapped is mentioned in the report, which is discussed in more detail below. In that regard, the evidence showing Cain's motive to entrap Defendant Grebe was similarly excluded from the report. There is not mention of the money paid to Cain by the Government, Cain's desire to be affiliated with law enforcement, Cain's financial problems. and Cain's previous failed attempts to serve as a law enforcement informant.

Third, the PSI does not mention that the FBI failed to follow its own procedures by failing to preserve potentially exculpatory evidence which may have been contained on Cain's computer. Additionally, Agent Sharkey admitted that he destroyed a blue piece of paper that contained writing by Defendant Wise.

Fourth, the PSI does not mention the ridiculous nature of the alleged plot, instead referring to it as utilizing "a clever delivery device." PSI at page 6, ¶ 21. The evidence was clear that alleged plot could have never been carried out and was scientifically impossible, which is consistent with the jury's verdict.

Fifth, the PSI does not mention the mountain of evidence that indicates that Cain's testimony was completely unreliable. Cain's testimony was riddled with inconsistencies and demonstrably false statements. The Government paid out over $16,000 on Cain's behalf. Cain's own father and ex-wife testified that he is not a truthful person and cannot be believed. The jury's verdict strongly indicates that they completely rejected Cain's testimony. All of this is completely ignored in the report, which relies almost exclusively on Cain's testimony.

Sixth, the PSI does not mention the testimony of Nora Smith. Ms. Smith testified as to Defendant Grebe's lack of predisposition to commit the charged

Defendant Grebe's Objections To
The Presentence Investigation Report                                                6

offenses. In fact, the Government offered no evidence that Defendant Grebe was predisposed to commit these offenses prior to his meeting John Cain. Additionally, Ms. Smith testified as to Defendant Grebe's non-violent nature and serious heart condition.

### III.
### Objection To Offense Level Computations

Defendant Grebe was convicted of two counts of sending threatening e-mails. Defendant concurs with the Government that U.S.S.G. § 2A6.1 (Threatening or Harassing Communications) is the proper guideline to use in determining the appropriate sentence. PSI at page 12, ¶ 25. Under this guideline, the base level is 12, or a sentence of 10-16 months. Incredibly, through a number of upward adjustments, the Government is attempting to increase the sentence from 10-16 months to 360 months to life. These adjustments amount to an increased sentence of over 360% above the base level 12. As set forth in detail below, Defendant strongly disagrees with these upward adjustments and believes that the appropriate sentence level is 12 or 10-16 months.

### A.    There Is No Evidence That Defendant Grebe Had An Intent To Carry Out The Threats.

The Government seeks a 6 level increase, arguing that there was evidence that Defendant Grebe had an intent to carry out the threat. PSI at page 7, ¶ 28. According to the guideline, this adjustment may be made only if the defendant engaged in "**conduct** evidencing an intent to carry out such threat." U.S.S.G. § 2A6.1(b)(2) (emphasis supplied). This adjustment, if adopted by the Court, would alone over double the possible sentence above the base level 12. Because of the enormous impact of this adjustment on the possible sentence and to satisfy the due process rights of Defendant Grebe, the Government must prove the alleged intent with clear and convincing evidence before the Court applies this 6 level

adjustment. *United States v. Restrepo*, 946 F.2d 654, 656 n. 1 (9th Cir. 1991 (en banc) (suggesting that clear and convincing evidence is the standard for extraordinary upward adjustments) *cert. denied*, 503 U.S. 961 (1992); *United States v. Townley*, 929 F.2d 365, 369 (8th Cir. 1991) ("At the very least, McMillan allows for the possibility that the preponderance standard the Court approved for garden variety sentencing determinations may fail to comport with due process where, as here, a sentencing enhancement factor becomes 'a tail which wags the dog of the substantive offense'").

The Government introduced no evidence at trial of **conduct** by Defendant Grebe indicating an intent to carry out the threat. The Government conducted searches of each Defendant's property and found no evidence of biological weapons or material necessary to build a "weapon of mass destruction." In fact, this requested adjustment is directly contrary to the jury's verdict. The jury acquitted Defendant Grebe of conspiring to use a weapon of mass destruction (Count 1), of which intent is a necessary element. The only arguable evidence of an intent to carry out the threat is the testimony of John Cain concerning statements (not conduct) made by Defendant Grebe. For good reason, the jury clearly rejected Cain's testimony in this regard and acquitted Grebe on the conspiracy charge. Clearly, based only on the testimony of Cain, the Government has not meet its burden. Accordingly, the Court should refuse the Government's request for a six level increase because there is **no credible evidence** of any such conduct evidencing an intent to carry out the threats.

**B.**   **The Government Erroneously Alleges That The Offenses On Which Grebe Was Convicted Involved Sending More Than Two Threats.**

The Government seeks a 2 level increase because "defendant's relevant conduct involved the electronic mailing of more than two (2) threats." PSI at page 7, ¶ 29. This adjustment is improper for two reasons.

First, the Government has misconstrued this guideline. Apparently, the Government is taking the position that merely sending more than two threats is enough to justify an upward adjustment. However, the statute states: "If the **offense involved more than two threats, increase by 2 levels.**" U.S.S.G. § 2A6.1(b)(2) (emphasis supplied.)

On its face, the guideline does not apply. Defendant Grebe was charge with 7 counts of sending a single threat to 7 different Government agencies. As such, each charged offense only involved a single threat. Accordingly, this guideline does not apply because the two offenses for which Defendant Grebe was convicted only involved one threat each.

Second, even if the Government's strained construction of this guideline applied, an upward adjustment would be inappropriate. The jury acquitted Defendant Grebe of sending 5 of the 7 alleged threats. Therefore, Defendant Grebe was not found guilty of sending more than two threats. As such, the Government is requesting the Court to increase Defendant Grebe's sentence for conduct of which Grebe was acquitted.

A court may but is not required to consider conduct for which a defendant was acquitted in determining the sentence, so long as that conduct has been proved by a preponderance of the evidence. *U.S. v. Watts*, 117 S.Ct. 633, 638 (1997). There is a strong likelihood that the jury acquitted Defendant Grebe on those other threat charges based upon the entrapment defense. It seems particularly repugnant to increase a defendant's sentence based upon conduct which was arguably induced by governmental entrapment. Moreover, each of these threats were virtually identical and sent out to various Government agencies in a matter of minutes. As such, these threats should be reasonably viewed as a single threat made to the Government. Treating each of these threats separately is no more than making a distinction without any real meaning in an

effort to increase the sentence. Accordingly, it would be fundamentally unfair and a violation of Defendant Grebe's due process rights for the Court to adopt this upward adjustment.

C.     **The 3 Level Victim-Related Adjustment Suggested By The Government Does Not Apply.**

Pursuant to U.S.S.G. § 3A1.2(a), the Government requests a 2 level adjustment because the "intended victims of the instant offense were government employees and members of their families." PSI at page 8, ¶ 30. However, the Application Notes to this guideline clearly show that this adjustment does not apply to this case. Specifically, Note 1 states:

> This guideline applies when specified individuals are victims of the offenses. This guideline does not apply when the only victim is an organization, agency, or the government.

Undeniably, the threats sent in this case did not specify any individual victims. While the e-mails were addressed to the head of the respective governmental agency, the named recipient was expressly excluded from the message. The example given in the PSI demonstrates this point:

Dear (Designated Agency)

Your (Designated Agency) employees and their families have been . . .

PSI at page 6, ¶ 17. Moreover, the most reasonable construction of the threats are that they were made to "an organization, agency, or the government" and not to any "specified individual." Accordingly, this adjustment does not apply to this case.

D.     **The 12 Level "Federal Crime Of Terrorism" Adjustment Does Not Apply To This Case.**

As its final adjustment, the Government seeks an increase of 12 levels and to place Defendant Grebe in Category VI of the sentencing table by alleging that

Defendant Grebe committed a "federal crime of terrorism." PSI at page 8, ¶ 31.
Section 3A1.4(a) of the Guidelines states:

Terrorism

(a)     If the offense is a felony that involved, or was intended to
        promote, a federal crime of terrorism, increase by 12 level; but
        if the resulting offense level is less than level 32, increase to
        level 32.

(b)     In each such case, the defendant's criminal history category
        from Chapter Four (Criminal History and Criminal
        Livelihood) shall be Category VI.

A "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5) as follows:

(5) the term "Federal crime of terrorism" means an offense that--

(A)     is calculated to influence or affect the conduct of
        government by intimidation or coercion, or to retaliate
        against government conduct; and

(B)     is a violation of . . . [section] 2332a (**relating to use of
        weapons of mas destruction**).

(Emphasis supplied.)

The Court should refuse to apply this adjustment. Based upon the clear
language of the statute, the offense must relate to the "use of weapons of mass
destruction" in order to constitute a "Federal crime of terrorism." However,
Defendant Grebe was convicted for **threatening not using** a weapon of mass
destruction. In fact, Defendant Grebe was acquitted on the offense of conspiring
to use a weapon of mass destruction (Count One). As such, this adjustment does
not apply because Defendant Grebe did not commit a "Federal crime of terrorism."
In addition, the Government present no credible evidence that the e-mails sent to
the IRS and DEA were "calculated to influence or affect the conduct of
government by intimidation or coercion." The only evidence presented on this
point was the unreliable testimony of the Government's paid informant, Cain. The

Court should not adopt this severe adjustment based upon such untrustworthy evidence.

## IV.
### The Court Should Depart Downward From The
### <u>Guidelines Because Of The Unusual Nature Of This Case</u>

The United States Supreme Court has held that a district court has significant discretion in departing from the guidelines in appropriate cases. In fact, a departure from the Guidelines by the District Court "will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by the sentencing courts." *Koon v. U.S.*, 166 S.Ct. 2035, 2046 (1996); *United States v. Walters*, 87 F.3d 663, 672 n. 10 (5th Cir. 1996) (stating that based on *Koon* the 5th Circuit will review a district court's departure from the guidelines under an abuse of discretion standard).

The Supreme Court further acknowledged that a sentencing court is allowed to depart from the Guidelines when "certain aspects of the case are found to be unusual enough for it to fall outside the heartland of cases in the Guideline." *Koon*, 166 S.Ct. at 2046. According to the Supreme Court the Guidelines "'place essentially no limit on the number of potential factors that may warrant departure." *Id.* at 2050. The only limit placed on the sentencing court is those factors specifically enumerated factors stated in the Guidelines which may not be considered. *Id.*; U.S.S.G. ch. I, pt. A.

This case has numerous unusual factors which clearly take it outside the heartland of the Guidelines, as follows:

### A.     The Evidence Of Entrapment Warrants Departure.

Several courts have departed from the Guidelines when a government agent's or informant's conduct was similar to entrapment, coercion, duress, or persuasion, even if such conduct did not arise to the level of a complete defense to the crime. *See United States v. Garza-Juarez*, 992 F.2d 896 (9th Cir. 1993)

*cert. denied*, 510 U.S. 1058 (1994) (upholding district court's departure based upon fact that "the conduct of this investigation, although not amounting to entrapment, was sufficiently coercive in nature to warrant a downward departure"); *United States v. Giles*, 768 F.Supp. 101, 103 (S.D.N.Y.) (granting downward departure based on "the manner in which [defendant] was set up for this crime by the Government's agent," even though jury rejected entrapment defense) *aff'd*, 953 636 (2d Cir. 1991) *cert. denied*, 112 S.Ct. 1509 (1992). As one Court stated when granting a downward departure:

> The seriousness of the defendants' participation is mitigated by the conduct of the government agent. While there was no allegation of entrapment, there was evidence at the sentencing hearing that Agent Goldman's conduct influenced defendants' decisions to continue playing a pivotal role.

*United States v. Takai*, 941 F.2d 738, 741 (9th Cir. 1991).

In this case, the conduct of the Government and its paid informant, John Cain, clearly arises to a level to warrant departure from the Guidelines. The two threats upon which Defendant Grebe was convicted were e-mailed to the IRS and the DEA. Agent Church testified that he may have instructed John Cain not to suggest to Defendant Grebe to whom the e-mails should be sent. Mr. Cain agreed that he received that instruction. Agent Church testified that it would be wrong and constitute entrapment if Mr. Cain suggested where to send the e-mails. However, the record is clear that Cain did suggest to Defendant Grebe that e-mails should be sent to the DEA and the Secret Service.

In fact, Cain played the most significant role in the offense. None of the defendants had the computer expertise or equipment necessary to send the e-mails. Cain retrieved the e-mail addresses and, in fact, suggested some if not all of the agencies to receive the message. Cain input all of the addresses in his computer. Cain set up the meeting during which the e-mails were sent. Cain continually prodded and prompted Defendant Grebe to talk about the e-mails.

Cain actually sent the e-mails. In fact, the Government presented no evidence that these e-mails would have been sent but for the involvement of Cain. Finally, the Government presented no evidence that Defendant Grebe was predisposed to commit the charged offenses prior to his meeting John Cain.

The evidence also indicates that FBI engaged in conduct to cover up the entrapment. First, there is substantial evidence that the FBI failed to preserve evidence relevant to Defendant Grebe's entrapment defense. The Government failed to secure Cain's computer after the e-mails were sent. The evidence was uncontroverted that material was erased from Cain's computer prior to the Court ordering the Government to seize the computer. The FBI failed to follow its own policies and procedures in securing Cain's computer. Indeed, the Government filed a statement with the Court admitting the failure of the FBI to follow its procedures.

Substantial evidence was presented to indicate that Cain was the author of the threat that was e-mailed to the IRS and DEA. Cain had the "bookmark" of the biography of Charles Rossotti, IRS Chairman, on his computer. In addition, the term "deliver system" was used in the threat and just happens to be a defined term in the 28 U.S.C. § 178. Cain had several "bookmarks" saved on his computer allowing him to search the United States Code. Agent Church testified that it would have been entrapment if Cain had authored the message. By failing to timely seize Cain's computer, Defendant Grebe was deprived of evidence which could have definitively proved that Cain was the author of the e-mail, which would have been critical to Grebe's entrapment defense.

Second, Agent Sharkey testified falsely at trial concerning the following matters: (1) when the FBI received authorization to conduct tape recorded surveillance; (2) when Cain agreed to testify for the Government; and (3) when the FBI was authorized to pay Cain for his "services." Agent Sharkey testified

that such events did not occur until sometime during June, 1998. However, internal Government correspondence, which was not produced to Defendant until during trial, indicated that all of these events occurred during March, 1998, which was before Cain even met Defendant Grebe. This attempt by Agent Sharkey to cover up these matters strongly indicates that the Government set out to entrap Defendant Grebe.

The amount of compensation paid by the Government on behalf of Cain and the Government's misrepresentation of that compensation during certain pre-trial hearings further suggest misconduct and warrants departure. Specifically, the United States Attorney represented that only $1,500 had been paid out to Cain. Agent Sharkey was present during those hearings and undeniably knew that, in fact, over $16,000 had been out on behalf of Cain. However, Agent Sharkey sat silently while these misrepresentation were made to the Court. The true information was not provided to defense counsel until the Thursday or Friday before trial. During the trial, Agent Sharkey testified that the compensation would continue for some indefinite time in the future.

**B.    The Absurd Nature Of The Alleged Plot, Lack Of Intent To Carry Out The Scheme, And Nature Of The Offense Warrant A Departure From The Guidelines.**

In this case, the Government is asking the Court to impose a sentence of thirty (30) years to life on Defendant Grebe. The Guidelines could not have possibly contemplated a case such as this leading to such a severe sentence. Boiled down, Defendant Grebe was convicted for written speech, albeit threatening speech. The alleged plot was simply ridiculous and could not possibly have been carried out. The Government presented no evidence of an intent to carry out the plot. In fact, the jury acquitted Defendant Grebe of conspiring to use a weapon of mass destruction (Count I). Courts have departed

from the Guidelines in analogous cases. *See United States v. Walter*, 87 F.3d 663 (5th Cir.), cert. denied, 117 S.Ct. 498 (1996) (defendant who did not receive any financial benefit from money laundering outside the heartland); *United States v. Lombard*, 72 F.3d 170 (1st Cir. 1995) (holding that a court could depart downward where slim proof of murder, for which defendant had been acquitted, resulted in a mandatory life sentence for possession of a firearm).

Incredibly, in the PSI, the Government refers to the alleged plot to use weapons of mass destruction as including a "clever delivery device." PSI at page 6, ¶ 21. This so-called "clever delivery system" was an alleged Bic lighter modified to work as a dart gun to shoot individuals with cactus thorns tainted with rabies, anthrax or botulism. The Government presented no evidence that such a contraption could be built. The testimony of Agent Decker also indicated that it would be extremely improbable to successfully infect someone in this manner and that he had never heard of such a device. This device or the plan to infect people with biological agents was not discussed by Defendant Grebe or any one else on the Government's surveillance tapes. The searches conducted by the Government found no evidence to substantiate this ridiculous plot. As such, the only evidence of Defendant Grebe's intent to build this contraption came from the unreliable testimony of Cain. All of this conclusively shows that this scheme could never have been carried out and that there was no intent to even try. Under these circumstances and considering the unusual nature of the allegations, a significant departure from the Guidelines is warranted.

## IV.
## The Court Should Not Impose A Fine Because
## Defendant Grebe Does Not Have The Ability To Pay

The Court is not required to impose a fine on Defendant Grebe. 18 U.S.C. § 3571(a) ("A defendant who has been found guilty of an offense **may** be

sentences to pay a fine.") (emphasis supplied). Prior to imposing a fine, the Court must determine that the defendant has the ability to pay. *United States v. Pattan*, 931 F.2d 1035 (5th Cir. 1991), *cert denied*, 504 U.S. 958 (1992). In this case, the Court appointed counsel to represent Defendant Grebe, due to his indengency. Defendant Grebe objects to the matters stated in ¶ 67 of PSI because it significantly overstate the assets of Defendant Grebe. Defendant Grebe does not have the ability to pay a fine and requests the Court to waive any fine.

## VI.
### Defendant Grebe Adopts The Objections And Argument Urged By Defendant Wise

The PSI for Defendant Wise is substantially the same as Defendant Grebe's PSI. Defendant Grebe hereby adopts all objections and arguments urged by Defendant Wise as if stated verbatim herein.

## VII.
### Prayer

In connection with the PSI, Defendant Grebe prays that: (1) the Court sustain the objections stated herein; (2) reject the adjustments urged by the Government; (3) impose a sentence in the range of 10 -- 16 months pursuant to level 12; (4) waive the fine; and (5) for such other and further relieve as Defendant Grebe may be justly entitled.

Respectfully submitted,

DANIEL D. HERINK
State Bar No. 00790873
Fed. Admissions No. 18659
**RODRIGUEZ, COLVIN & CHANEY, L.L.P.**
1201 E. Van Buren St.
P.O. Box 2155
Brownsville, Texas 78522
(956) 542-7441
(956) 541-2170 - Facsimile

ATTORNEY FOR DEFENDANT
JACK ABBOTT GREBE, JR.

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing document was served upon the following counsel of record:

Mr. Keith N. Uhles
ROYSTON, RAYZOR,
VICKERY & WILLIAMS, L.L.P.
P. O. Box 3509
Brownsville, Texas 78523-3509

Mr. Mervyn Mosbacker
U.S. District Attorneys Office
500 E. 10th Street
P.O. Box 16671
Brownsville, TX  78520

by via certified mail return receipt request, via hand delivery and/or via facsimile on this the _4th_ day of January, 1999.

DANIEL D. HERINK

"EXHIBIT D"

JUDGMENT AND COMMITMENT ORDER

United States District Court
Southern District of Texas
ENTERED

FEB 11 1999

Michael N. Milby, Clerk of Court
By Deputy Clerk _O. H. Qedope_

# United States District Court
## Southern District of Texas

Holding Session in    **Brownsville**

United States District Court
Southern District of Texas
FILED

FEB 11 1999

Michael N. Milby, Clerk of Court

UNITED STATES OF AMERICA

v.

**JACK ABBOTT GREBE, JR.**

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

**Case Number:  B-98-00415-S1-02**

**Daniel Herink**
Defendant's Attorney

☐ See Additional Aliases - Sheet

THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____ which was accepted by the court.

☑ was found guilty on count(s)  _5 and 6 on October 29, 1998_  after a plea of not guilty

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. §§ 2332a(a)(2), 2332a(c)(2) and 2 | Threatening to use a weapon of mass destruction | 07/01/1998 | 5 and 6 |

☐ See Additional Counts of Conviction - Sheet

The defendant is sentenced as provided in pages 2 through _6_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s) 1, 2, 3, 4, 7, and 8 in B-98-415-S1-02

☑ X̶X̶X̶X̶X̶X̶X̶X̶ Original Indictment, Cr. Dkt. No. B-98-415-02 is dismissed  X̶X̶X̶

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Social Security No.: _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_

Defendant's Date of Birth: _9/26/1954_

Defendant's USM No.: _82283-079_

Defendant's Residence Address:

C/O 2209 West Kennedy

Harlingen          TX          78575

Defendant's Mailing Address:

**TRUE COPY I CERTIFY**
**ATTEST:**
C/O 2209 West Kennedy

Harlingen   **MICHAEL N. MILBY, Clerk of Court**
            Tx          78575
         By _Leander Minden_
                        Deputy Clerk

ℳ LWM/nma

February 5, 1999
Date of Imposition of Judgment

_Hilda Z_
Signature of Judicial Officer

**HILDA G. TAGLE**
**UNITED STATES DISTRICT JUDGE**
Name and Title of Judicial Officer

_Feby 11, 1999_
Date

_240_

DEFENDANT:    JACK ABBOTT GRELL, JR.                          Judgment - Page  2  of  6

CASE NUMBER: B-98-00415-S1-02

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of

_____292_____ months as to Count 5 and 292 months as to Count 6,

to run concurrently to Count 5.

☐ See Additional Imprisonment Terms - Sheet

☑ The Court makes the following recommendations to the Bureau of Prisons:

   The defendant be placed in an institution in Texas.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ _____ on _____

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ by 2 p.m. on _____

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____ at _____ with a certified copy of this judgment.

                                    _____
                                    UNITED STATES MARSHAL

                              By    _____
                                    Deputy U.S. Marshal

**NOTE: U.S. Marshal - This is 1 of _____ Judgments.

**DEFENDANT:    JACK ABBOTT GREEN, JR.**

Judgment - Page  3  of  6

**CASE NUMBER: B-98-00415-S1-02**

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of ___5___ years as to Count 5,

and five (5) years as to Count 6, to run concurrently to Count 5.

☐ See Additional Supervised Release Terms - Sheet

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.
The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*
The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

☐ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable)

☑ The defendant shall not possess a firearm as defined in 18 U.S.C.§ 921. (Check, if applicable)

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the additional conditions on the attached page.

☐ See Special Conditions of Supervision - Sheet

## STANDARD CONDITIONS OF SUPERVISION

1)  the defendant shall not leave the judicial district without the permission of the Court or probation officer;
2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4)  the defendant shall support his or her dependents and meet other family responsibilities;
5)  the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6)  the defendant shall notify the probation officer ten days prior to any change in residence or employment;
7)  the defendant shall refrain from excessive use of alcohol;
8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)  the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement;
14) if restitution has been ordered, the defendant shall make restitution as ordered by the Court and in accordance with the applicable provisions of Title 18 U.S.C. § 2248, 2259, 2264, 2327, 3663, 3663A, and/or 3664. The defendant shall also pay the assessment imposed in accordance with Title 18 U.S.C. § 3013;
15) the defendant shall notify the U.S. Probation Office of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution, fines, or special assessments.

DEFENDANT:    JACK ABBOTT GREER, JR.

CASE NUMBER: B-98-00415-S1-02

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **Totals:** | $200.00 | | |

☐ If applicable, restitution amount ordered pursuant to plea agreement ............  _____

☐ See Additional Terms for Criminal Monetary Penalties - Sheet

# FINE

☐ The above fine includes costs of incarceration and/or supervision in the amount of  _____ $0.00

The defendant shall pay interest on any fine of more than $2,500, unless the fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612 (f). All of the payment options on Sheet 5, Part B may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612 (g).

☐ The Court determined that the defendant does not have the ability to pay interest and it is ordered that:
  ☐ The interest requirement is waived.
  ☐ The interest requirement is modified as follows:

# RESTITUTION

☐ The determination of restitution is deferred until _____ . An Amended Judgment in a Criminal Case will be entered after such determination.

☐ The defendant shall make restitution to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below.

| Name of Payee | **Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| **Totals:** | $0.00 | $0.00 | |

☐ See Additional Victims
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT:    JACK ABBOTT GRELL, JR.

CASE NUMBER: B-98-00415-S1-02

# SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment: (2) restitution; (3) fine principal; (4) cost of prosecution; (5) interest; (6) penalties.

Payment of total fine and other criminal monetary penalties shall be due as follows:

A  [✓] in full immediately; or

B  [ ]  _____  immediately, balance due (in accordance with C, D, or E); or

C  [ ] not later than _____  ; or

D  [ ] in installments to commence _____  day(s)
   In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision, the U.S. probation officer shall pursue collection of the amount due, and shall request the court to establish a payment schedule if appropriate; or

E  [ ] in _____(e.g. equal, weekly, monthly, quarterly) installments of  _____
   over a period of _____ year(s) to commence _____day(s) after the date of this judgment.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Special instructions regarding the payment of criminal monetary penalties:

[ ] Joint and Several

| Case Number (Including Defendant No.) | Defendant Name | Joint and Several Amount |
|---|---|---|
| | | |

[ ] The defendant shall pay the cost of prosecution.

[ ] The defendant shall pay the following court cost(s):

[ ] The defendant shall forfeit the defendant's interest in the following property to the United States:

[ ] See Additional Forfeited Property - Sheet

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalty payments, except those payments made through the Bureau of Prison's Inmate Financial Responsibility Program, are to be made as directed by the Court, the probation officer, or the United States Attorney.

DEFENDANT:    JACK ABBOTT GREEN, JR.    Judgment - Page  6  of  6

CASE NUMBER: B-98-00415-S1-02

# STATEMENT OF REASONS

[✓] The Court adopts the factual findings and guideline application in the presentence report.

## OR

[ ] The Court adopts the factual findings and guideline application in the presentence report except:

[ ] See Additional Findings and Guideline Application Exceptions - Sheet

**Guideline Range Determined by the Court:**

Total Offense Level:   35

Criminal History Category:  VI

Imprisonment Range:   292  to   365   months.

Supervised Release Range:   3   to    5    years.

Fine Range:      $20,000.00      to       $200,000.00

[✓] Fine waived or below the guideline range because of inability to pay.

Total Amount of Restitution:         $0.00

[ ] Restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. § 3663(d).

[ ] For offenses committed on or after September 13, 1994 but before April 23, 1996 that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments.

[ ] Partial or no restitution is ordered for the following reason(s):

[ ] The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

## OR

[✓] The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s):

It is sufficient to address the primary statutory sentencing objectives of incapacitation, deterrence and promoting respect for the laws of the United States.

[ ] See Additional Reasons for Point Within Range  - Sheet

## OR

[ ] The sentence departs from the guideline range:

[ ] upon motion of the government, as a result of defendant's substantial assistance.

[ ] for the following specific reason(s):

[ ] See Additional Reasons For Departure From The Guideline Range - Sheet

"EXHIBIT E"

FIFTH CIRCUIT APPEAL OPINION

# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

No. 99-40247

D.C. Docket No. B-98-CR-415

**U.S. COURT OF APPEALS**

# FILED

JUL 3 1 2000

CHARLES R. FULBRUGE III
CLERK

UNITED STATES OF AMERICA

      Plaintiff - Appellee

v.

JACK ABBOTT GREBE, JR

      Defendant - Appellant

United States District Court
Southern District of Texas
FILED

SEP 1 5 2000

Michael N. Milby
Clerk of Court

Appeal from the United States District Court for the
Southern District of Texas, Brownsville.

Before WIENER and STEWART, Circuit Judges, and LITTLE, District
Judge.*

J U D G M E N T

      This cause was considered on the record on appeal and was
argued by counsel.

      It is ordered and adjudged that the judgment of the District
Court is affirmed in part and reversed in part, and the cause is remanded
to the District Court for further proceedings in accordance with the
opinion of this Court.

ISSUED AS MANDATE: SEP 1 3 2000

*Chief Judge of the Western District of Louisiana, sitting by designation.

OP-OA-J-1

A true copy
Test

Clerk, U. S. Court of Appeals, Fifth Circuit

By _____
        Deputy   SEP 1 3 2000

New Orleans, Louisiana

2 59